### UNITED STATES v. POWELL.

(Circuit Court, N. D. Alabama, N. D.    March 22, 1907.)

CONSPIRACY—CRIMINAL RESPONSIBILITY—CONSTITUTIONAL LAW—DEPRIVATION OF RIGHTS—RIGHT TO TRIAL BY DUE PROCESS OF LAW.

In Ex parte Riggins, 134 Fed. 404, the Circuit Court ruled that certain counts of the indictment were good, under Const. Amend. 13. It also held that two other counts based upon the fourteenth amendment were good, as the fourteenth amendment secured to a prisoner in custody of the sheriff, on accusation of crime against the state, the right, privilege, or immunity to have the benefit of a jury trial by the operation of the state's established course of judicial procedure, and that private individuals who lynched such a prisoner, to prevent his enjoying the benefit of such a trial, deprived him, in the constitutional sense, of a right secured to him under the fourteenth amendment, and could properly be indicted under sections 5508 and 5509 of the Revised Statutes [U. S. Comp. St. 1901, p. 3712]. The defendant in this case, who obtained a severance and demurred to the indictment, was a codefendant with Riggins, who appealed to the Supreme Court (26 Sup. Ct. 147, 199 U. S. 547, 50 L. Ed. 303) from a decision of the Circuit Court refusing to discharge him upon habeas corpus. The Supreme Court, holding that habeas corpus was not the proper mode of testing such questions, quashed the writ. Riggins' appeal was argued and submitted at the same term as the Hodges Case, 27 Sup. Ct. 6, 51 L. Ed. ——, which involved like questions under the thirteenth amendment. After the Supreme Court thus disposed of the Riggins appeal, it decided the Hodges Case, holding that similar rights to those claimed under the thirteenth amendment were not secured by the Constitution or laws, and made use of expressions in the latter opinion which, in the view the Circuit Court took of them, under the circumstances stated, made it doubtful whether the Supreme Court did not intend to hold that the United States had no power, under any circumstances, to deal with lawless private individuals for violation of rights secured under the fourteenth amendment.

The government insisted that the expressions in the Hodges opinion as to the fourteenth amendment "went beyond the case," and should not "control the judgment" as to the rights and immunities here claimed under the fourteenth amendment. The Circuit Court, while satisfied as to the soundness of the Riggins Case, as regards the counts based on the fourteenth amendment, was, nevertheless, of opinion that proper judicial subordination required the Circuit Court, under the circumstances stated, not to run counter to the last utterances of the Supreme Court as to the fourteenth amendment, though they "went beyond the case," and that the only court which could properly determine what was intended by these expressions is the Supreme Court itself, and accordingly *held*, sustaining the demurrers to the indictment, that no right, privilege, or immunity, under the fourteenth amendment, in respect of due process at any stage of the duty of the state in affording it, is secured under that amendment, unless there is actual denial of the right by the state or its officers; and that private individuals who take a prisoner from the custody of the state's officers and murder him, to prevent his enjoying the benefits of a trial by the operation of the state's established course of

judicial procedure, do not deprive him of the enjoyment in the constitutional sense, of any right secured to him by the Constitution or laws, and were not therefore indictable under sections 5508 and 5509 of the Revised Statutes.

(Syllabus by the Court.)

## On Demurrerr to Indictment.

The defendant, Robert Powell, was jointly indicted with one Riggins, under sections 5508 and 5509 of the Revised Statutes [U. S. Comp. St. 1901, p. 3712], for conspiracy "to injure, threaten, oppress and intimidate" one Horace Maples, a negro citizen of the United States, in the enjoyment of certain rights and privileges claimed to be secured by the Constitution or laws, under the thirteenth and fourteenth amendments. Maples was arrested at Huntsville, Ala., and confined by the sheriff on a charge of murder, that he might be dealt with according to law. On the 7th day of September, 1904, a mob overpowered or overawed the sheriff and a company of the Alabama National Guard which the sheriff had summoned to his assistance, took Maples from them, and hanged him in the state courthouse yard. The indictment contained six counts. The second, third, fourth, and fifth counts need not be further noticed, as they are based upon rights and privileges claimed under the thirteenth amendment, which the court was of opinion, under the decision of the Supreme Court in the Hodges Case, were not secured by the Constitution or laws of the United States. The first and fourth counts are based on rights and immunities alleged to be secured under the fourteenth amendment. The fourth count is as follows: "And the grand jurors aforesaid, upon their oaths aforesaid, do further present: That at the time and place and within the jurisdiction aforesaid, in the county of Madison, and state of Alabama, the said Robert Powell and Thomas Riggins, whose Christian names are to the said grand jurors otherwise unknown, and divers other persons to said grand jurors unknown, did conspire, combine, and confederate together, to injure, oppress, threaten, and intimidate one Horace Maples, a citizen of the United States, in the free and full enjoyment of the right, privilege, and immunity secured to him by the Constitution and laws of the United States, to wit, the right, privilege, and immunity to have the state of Alabama, acting by and through its officers, to afford him, the said Horace Maples, a citizen of the United States as aforesaid, a trial by due process of law upon accusation of crime preferred against him, when he, the said Horce Maples, was, as was then the fact, in the custody of the officers of the law of the state of Alabama, upon the charge of murder under the laws of said state, and was then and there being held by the officers of said state of Alabama in the county jail of the county of Madison, for the purpose of affording him such trial, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States."

The first count is the same in substance as the fourth, except that it alleges that, in furtherance of the conspiracy, the defendant went upon the highways, and, with malice aforethought, murdered Maples, etc., "to deprive him of the right, privilege, or immunity secured to him under the Constitution of the state of Alabama, to be tried by due process of law and acquitted, if innocent, and punished, if found guilty, in the courts of the state in accordance with, and the manner prescribed by, the laws of the state." A severance was ordered. Riggins then sued out a writ of habeas corpus from the Circuit Court, seeking release on the ground that the indictment charged no offense against the laws of the United States, and that it appeared that the court could never have jurisdiction of the offense charged. The Circuit Court denied the application and discharged the writ. Ex parte Riggins (C. C.) 134 Fed. 404. Riggins then appealed to the Supreme Court, which, on the 11th of December, 1905, quashed the writ and dismissed the application for it without prejudice on the ground that habeas corpus, under the circumstances, was not the proper remedy. Riggins v. United States, 199 U. S. 547, 26 Sup. Ct. 147, 50 L. Ed. 303. Powell's Case was continued by consent, from term to term, pending a decision of the Hodges Case, and the contempt proceeding before the Supreme Court in the Tennessee lynching case, and was submitted for decision on demurrer January 6, 1907. The demurrers set up, in sub-

stance, that the indictment does not show Powell violated any right, privilege, or immunity secured to Maples, under the Constitution or laws of the United States, or that any federal law had been violated, which provided for the punishment of the offense charged, and .that sections 5508 and 5509 of the Revised Statutes of the United States, the only law upon which the indictment is based, have no application to such a case.

Thos. R. Roulhac, U. S. Atty.
Shelby S. Pleasants, for defendant.

JONES, District Judge (after stating the facts). When the court discharged the writ of habeas corpus sued out by Riggins, it decided the questions raised by the demurrer adversely to the contention now made by this defendant. Ex parte Riggins (C. C.) 134 Fed. 404. Since that decision, the Supreme Court has decided the Hodges Case, 27 Sup. Ct. 6, 51 L. Ed. ——, which held, in effect, contrary to the decision of Justice Bradley in United States v. Cruikshank, 1 Woods, 308, Fed. Cas. No. 14,897, that the rights and immunities claimed here under the thirteenth amendment were not secured under the Constitution or laws.

It is now urged by the defendant that the expressions of the Supreme Court in the opinion in the Hodges Case, regarding the power of Congress under the fourteenth amendment, although the government expressly declined to claim anything under it in that case, are decisive of the questions arising here, under the fourteenth amendment. It is urged, on the other hand, by the government, that the Riggins decision, so far as concerns the fourteenth amendment, is right, and that the court ought not to depart from it, unless satisfied either that its decision is erroneous, or convinced that the Supreme Court intended by its remarks in the Hodges Case to decide the very question here presented, which was not then before that court. This renders it necessary to reexamine the grounds of the Riggins decision, and if, in the opinion of the court, it should not ·depart from it, then to determine whether what is said in the Hodges Case should "control the judgment" here.

1. Precise Matter Never "Drawn in Question" Before Supreme Court.

The precise issue the remaining counts present is whether a citizen lawfully held in the custody of the state, awaiting trial on a charge of crime, has any right or immunity, which Congress can protect under the fourteenth amendment, against lawless violence of private individuals, which prevents, and is designed to prevent, the state from affording the accused, when it endeavors to do so, the benefit of a trial according to the "law of the land," by the administration of the state's established course of judicial procedure.

The decisions of the Supreme Court as to the power of Congress to protect rights secured by the fourteenth amendment may be grouped into three classes, none of which include this case: (1) Denial by state legislation or hostile acts of state officers of rights secured by the amendment; (2) congressional interference, regardless of fault on the part of the state, by plenary legislation, creating direct rights within the state, to protect a right which is only an immunity to be exempt from invidious discrimination at the hands of the state, and which can

never bring any right into being or authorize any action of Congress, unless the state first makes such wrongful discrimination; (3) legislation by Congress which confused rights dependent upon the Constitution or laws with rights secured only by state laws, entwining them without distinction in the grasp of a statute whose provisions were incapable of separation, thus vitiating the enactment because broader than the power conferred. Only two cases in the Supreme Court present instances of the forcible taking of prisoners, charged with crime, from the custody of officers of the law, and neither of them involves in the remotest degree the principle which must control this case. In United States v. Harris, 106 U. S. 629, 1 Sup. Ct. 601, 27 L. Ed. 290, the indictment, which charged no fault on the part of the state or officers, was for conspiracy to deprive the prisoners "of the due and equal protection of the laws of the state of Tennessee"—a right of the enjoyment of which the prisoner cannot be deprived, in the constitutional sense, by the acts of private individuals, and of which he has the enjoyment, in the constitutional sense, if the state laws and its officers be without fault, although a mob may work its will upon the prisoner. Logan v. United States, 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 429, did not involve the power of Congress under the amendments. It turned purely upon considerations growing out of the nature of our government, and the sovereignty of the United States in the enforcement of its own laws. After a very careful search of the decisions of the Supreme Court, not one can be found in which the precise question here was involved, much less "drawn in question." Boyd v. Alabama, 94 U. S. 648, 24 L. Ed. 302.

Bearing in mind the caution which the Supreme Court itself has frequently given us, that "general expressions in every case are to be taken in connection with the case in which those expressions are used," and that they "ought not to control the judgment," if they go beyond the case, in a subsequent case, where "the very point is presented for decision," nor where the case "did not call for the ascertainment of the right in question," and recalling, too, that the Supreme Court has not infrequently reversed its own solemn decisions, upon grave constitutional questions, in the light of larger experience, and under the pressure of changed conditions, it seemed to the court that the Riggins Case presented an open question.

## 2. Narrow Construction Not Permissible.

In seeking the meaning of the prohibition put upon the state as to due process, in its various stages, and the extent of the power in Congress regarding it, the court felt that it could not ignore the influence of the rule that:

"New constitutional provisions originating in larger experience, securing the rights and liberty of the citizen, should have a liberal construction according to their spirit, rather than a narrow construction according to the letter."

And that it ought not to be unmindful of the utterances of the Supreme Court, in reference to a prohibition put upon the power of the United States, which are equally applicable to the prohibition here upon the power of the state, that:

"A close, literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it were more in sound than in substance. It is the duty of the courts to be watchful of the constitutional rights of the citizen."

Nor of its utterances that:

"The fourteenth amendment makes no attempt to enumerate the rights it designs to protect. It speaks in general terms, and these are as comprehensive as possible. Its language is prohibitory; but every prohibition implies the existence of rights and immunities." Strauder v. West Virginia, 100 U. S. 303, 25 L. Ed. 664.

The fourteenth amendment was adopted to secure actual enjoyment of rights, which that amendment for the first time guarantied to citizens of the United States, who were thereby made citizens also of the state in which they resided. In form, the prohibitions of the amendment were leveled at the means by which it was supposed those rights would most often be defeated, but it was the evil to be averted, and the rights thereby to be enjoyed, and not the particular form of the invasion, which were uppermost in the minds of the framers of the amendment. The intent and spirit of the command are that the enjoyment of the rights, which the amendment declares shall not be denied by the state, shall be worked out for those to whom the right was secured by full performance of the duties the amendment put upon the state. The performance of the duty by the state to its full extent is the dominant thought and purpose of the amendment. When the framers of the amendment, knowing that the states must continue to administer justice and punish crime within the state, coupled with this constant and continuing duty the condition that the state shall not deny due process of law, the substance of what they intended cannot be less than that the state shall afford to every person enjoyment of the benefits of due process, when it starts out to administer its justice in his case. Unless we surrender abjectly to the witchery of mere grammatical expression, and utterly desert the spirit of this clause, we must hold that the command, "no state shall deprive," etc., is only another form of command that each state shall afford enjoyment of the administration of its established course of judicial procedure, in a case like this. The dominant end and purpose the amendment had in view were not merely that the states shall pass proper laws and furnish proper officers, who endeavor to execute them, but that the duty imposed upon the state shall be so fully performed that the citizen shall have actual, physical enjoyment of the benefits of the right, as distinguished from fictitious enjoyment, in theory of law, of a right in the form of an enchanting declaration upon parchment. One main aim of the amendment was, in short, to put an end to the denial of the state's justice by means of the execution of private vengeance upon criminals, and persons charged with crime, by lawless private persons, when the prisoner was in the hands of the law, by giving power to Congress, standing behind the effort of the state, to bring that purpose to pass, by any mode whatever which does not overthrow or usurp the state's power.

3. Private Individuals Cannot, in the Constitutional Sense, Prevent Actual Enjoyment of "the Equal Protection of the Laws."

Whatever dissent there may be·from this statement of the purpose of the framers of the amendment, it is clear, upon any construction of it, that two classes of duties are imposed upon the state, each of which Congress is empowered "to enforce," which are far different in character and constitutional consequence and as to the things which constitute enjoyment. of them. One is the negative, general duty owed alike to everybody, not to do wrong, not to grant rights and privileges to one person, while denying them under the same circumstances to others, or, what is the same thing, denying "the equal protection of the laws." The other is a positive duty, and requires affirmative, sustained action at the hands of the states, compelling them, as we shall presently see, to do certain things, in given modes and times, in particular cases as they arise, without which the benefits of the right cannot possibly be had. The first prohibition is merely a constitutional demand that the states make and execute their laws fairly and impartially. When the states do that, the status is thereby created which the Constitution exacts, and the citizen or person is thereby put in full possession and the actual enjoyment, in the constitutional sense, "of the equal protection of the laws.". As this status can be created only by those who wield legislative power, and impaired or destroyed only by those who exercise official authority, it is impossible for private individuals to impair, in the constitutional sense, the enjoyment of the right to "the equal protection of the laws." The system for the redress of wrongs and the vindication of rights—"the equal protection of the laws"—is wholly the creation of the state, deriving its origin and force solely from the state. Whether these laws be obeyed or resisted by private individuals, it amounts to nothing more as to this phase of the prohibition than loyalty or disloyalty to state authority. No attack is made in such case upon the performance by the state of any duty the Constitution exacts, when there is resistance to the execution of such laws. The constitutional duty, when there has been no invidious discrimination, has already been fully performed, and the attack upon the execution of state laws, so far as it affects the right to the equal protection of the laws, is powerless to undo what has already been done, or prevent the enjoyment of any right secured thereunder by the Constitution or laws. Very clearly, therefore, the framers of the amendment, who were skilled in the construction of laws and Constitutions, did not contemplate conferring upon Congress any power to deal with lawless private individuals, for resisting the ordinary commands of the municipal code of the state, in so far as their execution involves only the affording of "the equal protection of the laws."

4. Private Individuals May, in the Constitutional Sense, Prevent Enjoyment of Due Process, in Certain Phases of the Duty of the State to Afford it.

It by no means follows, however, that the amendment did not intend to confer power upon Congress to deal with lawless private individuals who interrupt the performance of the other duty, flowing

from the prohibition regarding due process. This duty, unlike the other, is a positive duty, enjoined upon the state, and demands in particular cases as they arise, affirmative action of a particular kind at its hands in some stages of the duty. When, as here, the state proceeds against a person' or citizen to deprive him of life, this prohibition brings into play certain active immunities and rights, for the enjoyment of which the Constitution demands certain affirmative work, in a particular way, at the hands of the state, which can be accomplished only when the operation of the courts is undisturbed. The rights thus given by the amendment no longer depend alone upon the state law or Constitution. What the Constitution gives in this respect is its own gift, and the state law and Constitution enter into the right, in this aspect of the matter, only because descriptive, and therefore to be scanned in order to ascertain the extent of the right conferred. Necessarily, therefore, the rights so given find their final sanction, at every stage of their enjoyment, in the federal Constitution. The sum of the command, in the case we have here, is that the state must afford the prisoner the due administration of "its established course of judicial procedure." This mandatory duty results from the well-defined historical and constitutional meaning which for centuries has been accorded the phrase "due process of law." When the amendment employed that term, it inevitably included in its command the doing of all these things which are essential to the administration of the state's established course of judicial procedure, when the citizen or person is taken into custody and held for trial for crime. The command also went further, for the force of the term employed condemns and forbids any course of procedure, unless it "hears before it condemns, proceeds upon fixed principles and not arbitrarily, and renders judgment only after trial." If the established course of judicial procedure does not offend in these respects, the language of the Constitution adopts it as it exists in the state, and injects its requirements into the obligation of the duty the Constitution of the United States imposes on the state. The force of this clause, then, puts upon the state, to be performed for the benefit of the citizen or person, the affirmative duty of affording him the enjoyment of all those rights and privileges which are included in and go to make up the due administration of the state's established course of judicial procedure. What are these affirmative duties of the state, in such a case, and what constitutes their performance? Having put the accused in prison, upon an accusation of crime, in order to mete out its justice to him, the state must inform him of the nature and cause of the accusation. It must safely keep and protect him in prison, until it can give him the opportunity, as well as the right, to appear before its tribunal. When the state brings him there, it must compel his witnesses to attend, if they will not come. It must confront him with his accusers in open court, and give him the opportunity, as well as the right, to examine them there. The tribunal which it sets up to administer its justice in that case must hear him and his witnesses before it decides his fate. If he be acquitted, he is entitled to go forth unharmed. If he be found guilty, he must still be protected, and have opportunity to present whatever he can in arrest of judgment. If he be sentenced, even to death, he

still has the right to live, in the peace of the state and of the United States, until the sentence is executed in the mode and time and by the authority prescribed by law. Hurtado v. California, 110 U. S. 516, 4 Sup. Ct. 111, 28 L. Ed. 232:

5. Prisoner's Right to Benefit of Operation of State's Established Course of Judicial Procedure, Secured by the Constitution of the United States, Against Lawlessness of Private Individuals.

In Alabama this course of procedure entitles the prisoner to something more, which this clause, as it requires the state to put in operation its established course of judicial procedure, commands the state also to afford him. He must be indicted and tried by a jury of his peers, from whom he has the right to exclude those legally disqualified. He must have an opportunity to know and to except to the rulings of the judge. He has the right to appeal and to suspend execution of the sentence, until his case is determined in the appellate court, and must have opportunity to perfect and prosecute his appeal. These latter rights, the state, which is supreme, save as restricted by the Constitution of the United States or the organic restraints it puts upon itself, may deny or withdraw. The other privileges and immunities, first described above, which the prisoner is entitled to enjoy, have been defined in the jurisprudence of English speaking peoples for ages, and imbedded in the Constitution, and cannot be taken away by the state. The only reason why the state cannot take them away is that the operation of those instrumentalities of justice, to whatever extent is necessary to constitute administration of judicial procedure, when that duty is involved at the hands of the state, is secured as a right to every person by the Constitution of the United States. The Constitution has not only recognized the right and prohibited its denial, but, by the very force of the term employed, has defined its constituent elements, by adopting the state law in that respect, which prescribes what is necessary to constitute enjoyment of the right, and fixes the modes and channels in which the duty of affording it shall be exercised, and points out who shall give enjoyment of it, and then gives congress special authority "to enforce" performance by the state. It is impossible to conceive of any right "accorded by, arising under or dependent upon the Constitution or laws," if the enjoyment of the benefit of the operation of the state's established course of judicial procedure, in view of the considerations named, is not secured by the Constitution of the United States. The citizen or person cannot, in the nature of things legal and finite, have enjoyment of the benefits of the right this clause is intended to secure, by requiring the doing of those affirmative acts, if lawless private individuals, by themselves punishing the prisoner, prevent the state's officers from taking him into its tribunals, hearing him and his witnesses, confronting him with his accusers, and then having its officials in whom the power resides pronounce judgment of acquittal or conviction, as this clause of the Constitution commands the state to do. As private individuals can prevent the doing of these things, and consequently cut off the enjoyment of the rights which would result if the orderly working of the functions of the

courts be not impeded, it is undeniable that private individuals, in some phases of the duty, can prevent enjoyment, in the constitutional sense, of due process of law at the hands of the state. The framers of the amendment were not ignorant that the practice of mobs to take prisoners accused of crime from the custody of the state, and murder them, to prevent the state's administering its justice, was one great evil which prevented citizens or persons from having, at the hands of the state, the enjoyment of the benefit of the administration of the state's established course of judicial procedure, which it was the purpose of the amendment the prisoner should enjoy, and from the enjoyment of which he is forever cut off, when the mob works its will upon him, while in the hands of the officers of the law. What right have we, then, to impute to the framers of the amendment, when it gave Congress the power "to enforce" the command, any intention to withdraw from the power, by the very same words which conferred it, all strength to protect the means by which alone the right can be enjoyed, against the attacks of lawless private persons upon the state's efforts to do things the Constitution commands it to do, simply because the state has vainly attempted to obey the constitutional command?

## 6. Full Performance Exacted.

It is full performance which is exacted. Nothing less can satisfy the intent of the amendment, or bring or keep in play the instrumentalities of justice, which the Constitution declares must be put and kept at work to vindicate the enjoyment of the benefits of the right, which it is the purpose of the constitutional mandate to secure. If this be true, and the spirit and reason of the constitutional command, as well as the bare form in which it is phrased, be given consideration, what just foundation is there for holding that its framers intended that the attempt and failure of the state to fully perform these duties, in the manner this clause requires they shall be discharged, should deprive Congress of all power to deal with private individuals, who designedly cause such failure? The effort of the state to perform the duty, when it falls short of full performance, can never give enjoyment of the performance of the duty. The power is commensurate with the duty of Congress, which is "to enforce" full performance. The only effect of the state's failure, when it attempts to perform the duty, is that it subtracts from the power of all right to interfere with state laws and state officers. The power still lives, because the duty remains unexecuted, and the power of Congress is driven into other channels of the duty which Congress is "to enforce." Any other conclusion would put the power and right out of being, the moment the state unsuccessfully attempted to perform the prescribed duty, as effectually as if the amendment had never been passed, or the right had never existed, notwithstanding the duty to be discharged has not been accomplished, and there has been no enjoyment of the benefit of the right secured. The rule is: "When the end is required, the means are given." When power is given to bring about a defined purpose, authority goes with the power to prevent or remove all obstacles which stand in the way of the accomplishment of that pur-

pose. This is true in every case, unless the grant of power be narrowed to particular measures. Under the genius of our institutions, federal dealing with breaches of the duty by the state is a far more delicate function than calling private individuals to account for attacking the state's discharge of that duty. The sovereignty which gave the authority to deal with the officers of the state to accomplish an end hardly intended, when it became necessary to deal with individuals to effectuate that result, to deny all power to Congress to call them to account. Any "appropriate" means are left open to Congress to protect the discharge of the duty. All means are "appropriate" which directly promote the successful discharge of the duty, unless the use of such means be forbidden by some other provisions of the Constitution. "A right whether accorded by the Constitution of the United States, or only guarantied by it, even without any express delegation of the power, may be protected by Congress in such manner and form as Congress in the legitimate exercise of its discretion shall provide." Prigg v. Pennsylvania, 16 Pet. 539, 10 L. Ed. 1060. The legislation "may be varied to meet the necessities of the particular right." Reese v. U. S., 92 U. S. 214, 23 L. Ed. 563.

7. Rule Established by the Decisions for Ascertaining Boundaries. of the Power of Congress in this Regard.

The controlling consideration which impelled a bare majority of the Supreme Court, in the Slaughter House Cases, 83 U. S. 36, 21 L. Ed. 394, to deny power to the United States, under the fourteenth amendment, to strike down the monopoly there, as an invasion of the rights of citizens of the United States, was that upholding the principle it involved would subject to the power of Congress "the entire domain of civil rights heretofore belonging exclusively to the states," and "degrade state governments by subjecting them to the control of Congress in the exercise of powers heretofore conceded to them of the most ordinary and fundamental character." This power "of the most ordinary and fundamental character" is the power of the state to give the law which regulates its domestic affairs and internal concerns. The same test of the bounds of power in Congress to legislate for the protection of rights under the fourteenth amendment is repeated in the Civil Rights Cases, 109 U. S. 3, 3 Sup. Ct. 18, 27 L. Ed. 835. The limitation upon such exercise of power, save in case of direct wrong by the state, is that Congress must not enter the domain of state power, creating new rights therein, or changing or displacing its laws, or interfering with its authority, or, in other words, substituting the will of Congress for the will of the state, as to its domestic affairs and internal concerns. In this domain Congress is forbidden to enter, save for correction of wrong by the state, and then it can go no further than to cure the particular wrong.

A close analysis of the decisions of the Supreme Court, which are relied on to show that Congress is powerless to aid in any way, to secure enjoyment of the right when the state vainly endeavors to afford it, against lawless private individuals, will show that they do not hold to such a doctrine. On the contrary, all recognize the rule above stated

as the true test of the boundary of the legislative power of Congress in this regard. Even those decisions which speak of "certain fundamental rights recognized and declared, but not granted or created in some of the amendments to the Constitution," declaring that they "are thereby guarantied only against violation or abridgement by the United States or by the state, as the case may be; and cannot, therefore, be affirmatively enforced by Congress against unlawful acts of individuals"—recognize the principle in the last sentence of the quotation. Its terms are careful not to deny Congress all power against lawless individuals; but only to deny the power to "affirmatively" enforce, etc. Dealing with the subject in its constitutional aspect, when one speaks of denying power to "affirmatively" enforce, it is only another mode of denying power to Congress to invade the domain of state power. The expression used in this regard goes only to the extent that Congress can exercise no power to create or define due process, or erect the tribunals to afford it, or give the law as to their jurisdiction and power. It is merely a declaration that Congress shall not invade the domain of the state power, by seizing the state's machinery of justice, and working it itself, in its own way, and according to its own wishes, to afford enjoyment of due process. The reason of the rule and its consequence, which are phrased in concrete form, when it is said there is no power to "affirmatively" enforce, leave the power of Congress wholly unshackled to deal with lawless individuals in other ways, so long as its exercise takes no forbidden channels in aid of the enjoyment of the right. There is no intimation in any of the decisions of want of power in Congress to deal appropriately with lawless private individuals, who thwart personal enjoyment of rights intended to be effected by the discharge of the duty by the state, whether the state endeavors to obey or defy the constitutional command. Such dealing with private individuals is not "affirmative" enforcement of the right, since it is not usurpation or invasion of state power or state law for Congress to fasten a penalty upon the private lawbreaker for his attack upon a prisoner, to whom the state vainly endeavors to afford the benefits of the discharge of the constitutional duty, which can be had in no other way. Such an exercise of power by Congress leaves state power, state dignity, and state instrumentalities wholly unaffected and untouched, and yet secures and promotes enjoyment of the right.

8. Several Grounds of Power of Congress to Punish Attack upon Prisoner in Custody of State's Officers.

Congress has enacted no direct legislation for the punishment of attacks by private individuals upon the state's discharge of the constitutional duty here considered. That Congress has such power seems unquestioned, under the doctrine declared in Ex parte Virginia, 100 U. S. 345, 25 L. Ed. 676, and Ex parte Siebold, 100 U. S. 371, 25 L. Ed. 717. The state's officers, when in the discharge of a duty the Constitution demands of the state, represent the state. Attacks upon them, when they are thus acting, are attacks upon the state's discharge of the duty. If Congress may deal with such attacks because they thwart a constitutional purpose, why may it not, on like principle, punish an at-

tack upon the prisoner? Such an attack upon him while he is enjoying the administration of the established course of judicial procedure of the state, with a view to prevent his enjoyment of it, also thwarts a constitutional purpose. The right to punish the attack upon the prisoner, in a case like this, follows, not only because it is an attack upon the discharge of a constitutional duty by the state, but also because the prisoner, in the custody of the state, awaiting trial and deliverance according to law, is in the exercise of a right or function "accorded by, dependent upon or secured" to him by the Constitution. Waddell v. United States, 112 U. S. 80, 5 Sup. Ct. 35, 28 L. Ed. 673; Ex parte Yarbrough, 110 U. S. 658, 4 Sup. Ct. 152, 28 L. Ed. 274. The right of the United States to secure rendition of judicial procedure at the hands of the state is, now, by force of the fourteenth amendment, one of the special purposes for which sovereignty is delegated to the United States. Congress, representing the United States, which, at least, has "concurrent sovereignty" as to this matter, may, by virtue of its authority, legislate for that sovereignty, and punish attacks by lawless private persons upon the enjoyment of the right by the prisoner, upon like reason as upholds the power of the federal government to punish conspiracy to injure a person for giving information of a violation of its laws, or to prevent a prisoner from enjoying due process at the hands of the general government, or to rescue a prisoner in the hands of the extradition agent of the state. In re Neagle, 135 U. S. 10, 10 Sup. Ct. 658, 34 L. Ed. 55; In re Quarles & Butler, 158 U. S. 535, 15 Sup. Ct. 959, 39 L. Ed. 1080.

The power of Congress to legislate against private lawlessness, in order to protect the discharge of a duty the Constitution enjoins upon an officer of the state, even when Congress is given no power to "enforce it," is illustrated by sections 5278, 5279, of the Revised Statutes [U. S. Comp. St. 1901, p. 3597], which have stood unchallenged on our statute books for more than a century. Lascelles v. Georgia, 148 U. S. 537, 13 Sup. Ct. 687, 37 L. Ed. 549; Robb v. Connolly, 111 U. S. 635, 4 Sup. Ct. 544, 28 L. Ed. 542. Section 2 of article 4 of the Constitution commands the delivery of fugitives from justice upon the demand of the state from whence they fled. Congress is given no power to enforce the command, and it "imposes only a moral duty." The agent of the demanding state, who receives the prisoner, the Supreme Court holds, is a state officer merely. Yet, when a prisoner is surrendered to such agent to be returned to the demanding state, Congress punishes individuals who obstruct the discharge of the duty. The officer, under the fourteenth amendment, owes a duty to the United States, and may be protected in his efforts to discharge it, as well as punished by Congress for his dereliction in the performance of it. What difference is there in principle, unless it be in favor of the right here claimed, between the right of Congress to legislate, under section of article 4, for the punishment of private individuals who rescue a fugitive from justice in the custody of the agent of the demanding state, to prevent his being delivered up as required by the Constitution, and the right of Congress to legislate under section 1 of the fourteenth amendment, for

the punishment of persons who take a prisoner from the custody of the state's officers, and murder him, to prevent the state officers from delivering him, pursuant to the constitutional duty, to the courts of the state for trial?

### 9. Federal Legislation Dealing with Private Lawlessness Against a Prisoner in Custody is not Invasion of Any Reserved Right of the State.

The only possible ground for challenge of the right of Congress to deal with private lawlessness of individuals, in the case with which we are here concerned, is that in doing so the federal government invades some right reserved to the state. Plainly, Congress may legislate under the fourteenth amendment to punish private individuals in such a matter as this, as such exercise of power directly promotes the purposes of the amendment, and is necessarily implied, and is also authorized under clause 18, § 8 of article 1 of the Constitution, unless some other provision of the Constitution nullifies or restricts their scope in this respect. It is said the tenth amendment to the Constitution does that. But how? Wherein does such exercise of power touch any right reserved to the state?

Unquestionably, the same physical act may constitute an offense of an entirely different legal nature and consequence against the laws both of the state and of the United States. Waddell v. United States, 112 U. S. 80, 5 Sup. Ct. 35, 28 L. Ed. 673. The punishment of that act by the United States, so far as it transgresses its laws, cannot possibly be a violation of the law of any state. It has never been seriously claimed since the days of the Confederation that Congress is without power to punish an offense, because the same act also constitutes a violation of the laws of the state. The application of the conspiracy statute to the case of this mob, in the nature of things legal and finite, cannot operate to change the laws of the state, or trench in any way upon its authority to order persons and things within its borders, or operate to control its officers, or to diminish its authority over them, or to disturb its peace and dignity. It creates no new rights. It puts no new duty upon the state or its citizens, and does not change, in any way, the relations of the state to the federal government or their relations to the state or to each other. It cannot affect, in the remotest degree, the power and authority of the state to give the law which regulates and controls its own domestic and political affairs, or assail in any way that "residuary sovereignty," which is so essential to the happiness and freedom of a state "in an indestructible union composed of indestructible states." The only moral or legal consequence which can result, and surely it is not for evil, when federal power punishes mobs who defeat the enjoyment of due process at the hands of the State, when it is endeavoring to afford judicial procedure, is that the power of the United States is arrayed behind the power of the state to accomplish obedience to its own laws, as well as to the constitutional command, and thus doubles the guard about the state's altars of justice which enforce the duties which man owes to man around the fireside and home.

10. Meaning of Fourteenth Amendment Not to be Gathered by Spirit of Former System as to States' Rendition of Due Process.

Lastly, it is urged the fourteenth amendment could not have intended to permit Congress to deal with lawless private individuals, in a case like this, since it involves a far-reaching departure from the traditions and time-honored maxims of our government. True it is, prior to the great War, whatever invasion there was of enjoyment of the rights to life, liberty, and property, as secured and protected by state laws, whether accomplished by direct action of the state or by violence of mobs, was alike without the constitutional concern or power of the United States. The general government was powerless to aid in securing those rights by assisting in the execution of state law, unless the state itself first called for help under section 4 of article 4 of the Constitution. In that era of our constitutional history, which the Supreme Court itself describes as "historical and of another age," it was therefore a maxim of our constitutional life that the general government had no concern in the execution of our state laws, however necessary their enforcement to enjoyment of the fundamental rights of the citizen to life, liberty, or property, within the state, or whatever the form in which those rights were assailed. The great principle that the man at home should control home affairs, so dear to all who speak our tongue, had crystallized in the minds of the people into the conviction that the safeguarding of those fundamental rights was so peculiarly a matter of local concern that it was wrong to treat it as a matter of general concern, and dangerous to allow the general government any part in the duty, for any purpose whatever.

The drawing together of the people in closer relations, the need for stronger protection than localities were able, and oftentimes willing, to afford, and the conditions brought about by war, demanded additional safeguards for these rights. Provision had to be made for a future which was uncertain and full of peril. Race and sectional feeling, state action, and private lawlessness, operating alike in some form in every part of the Union, might hamper or prevent the enjoyment of these rights, and it was not deemed wise to leave their safeguarding wholly to the states, as in the past, though they were still primarily to depend upon the execution of their laws. Congress was therefore given power to see that the states accomplished their task. The general government is not left to the means provided by the states to secure any rights which the Constitution commands the states to afford. It may, or it may not, depend upon such instrumentalities. It is not bound, under the fourteenth amendment, to leave the protection of these rights to the execution of state laws, however inefficient it may prove in bringing about the results intended by the Constitution. It is not compelled to sit still until the state calls for the military arm of the government to put down individuals who defeat enjoyment of these rights, by preventing the execution of state laws.

In times of peace, reliance upon the might of the sword for the enforcement of rights given by the Constitution or laws is contrary to the spirit of our institutions, and abhorrent to our people. The framers of the amendment did not intend, as in the earlier days of the

Republic, to rest the protection of these rights, when the state vainly attempted to afford them, solely upon the power of the sword, which could be drawn only at the demand of the state. Although the power the amendment gives is to Congress to enforce the duty, the Supreme Court, under our judicial system, must be the final arbiter of what constitutes rendition of due process. The amendment contemplated the power given Congress, save in grave emergencies, where Congress may, perhaps adopt other modes, should be exercised by the passage of laws, whose execution by the courts, strengthening and enforcing the performance of the duties by the state, would work out the enjoyment of the rights the amendment sought to afford, whether the occasion for the resort to the courts arose from the denial of the right by state action, or was called into exercise merely for the punishment of private individuals, who thwarted the state in the effort to perform its duty. Having determined to this end that the United States might supervise and correct the action of the local sovereign, it would seem strange, indeed, if the amendment intended to deny to the general government, in accomplishing its object, all power to deal with private individuals who were subject to, but resisted, the laws of the local sovereign. The framers of the amendment, and the people who adopted it, were not building upon the old system, but laying on new foundations a different system for the enjoyment of due process within the state. The dominant idea of the amendment, repudiating the old thought and practice, is that the United States have rightful concern in the actual enjoyment by citizens of a state, who are also citizens of the United States, of due process within the state, and ought therefore to have part in seeing that the administration of due process in state tribunals accomplishes the enjoyment of those rights which it was the purpose of the fourteenth amendment to afford. The amendment conferred a new power for a benevolent purpose. We ought not to shrivel the power by treating it as a mere penal enactment against faithless state officers. The sovereignty which has power to impose a task upon a state, and "to enforce" its performance by any "appropriate" means, surely usurps no authority of the state, nor departs from its own grant of authority, when it simply stands to one side, and, without interfering in any way with the state's efforts or means, aids in the accomplishment of its duty, by bringing its independent power to bear, for the punishment of those who roll up obstacles in the state's pathway of duty.

### 11. Ex parte Riggins Not Followed.

Influenced by these considerations, the court felt compelled to hold, in Ex parte Riggins, notwithstanding the gravity and novelty of the ruling, that the indictment charged violation of rights secured by the amendment, and that sections 5508 and 5509 of the Revised Statutes [U. S. Comp. St. 1901, p. 3712] applied, and were "appropriate" means for redressing the violation of those rights. The government again urges the same arguments as decisive of this case, and insists that it is the duty of the court to follow Ex parte Riggins, unless it now be of opinion that the doctrine of that case is unsound, or, what is the same thing, that the precise question has never been decided.

by the Supreme Court adversely to the views of the Circuit Court. The insistence is pressed that what is said in the Hodges Case, as to the power of Congress under the fourteenth amendment, "went beyond the case" then before the court, and "ought not to control the judgment," under the Supreme Court's own rule in Cohens v. Virginia, 6 Wheat. 264, 5 L. Ed. 257, and Boyd v. Alabama, because the government admitted in the Hodges Case that the right there in question, if secured at all, could rest only on the thirteenth amendment, and declined to claim or contend for any thing under the fourteenth amendment. It is also urged that the Supreme Court, in view of its uniform habit not to pass upon constitutional questions when a ruling upon them can fairly be avoided, never intended, by what it said in the Hodges Case, to lay down the law for a case like this, and that this court ought not to follow what is there said on this point.

Ordinarily, this might be proper, and this court acted upon that view as to a series of obiter remarks in deciding the Riggins Case. There are circumstances, however, which make it improper, in the opinion of the court, to follow that rule in this case. The Riggins decision was made upon the very indictment. It was appealed to the Supreme Court, where it was submitted at the same term with the Hodges Case. The government, raising no objection to the mode of procedure, rested the identical constitutional questions here presented upon the opinion of the Circuit Court. The Supreme Court ordered the writ quashed, because habeas corpus, under the circumstances, was not the proper remedy. Riggins v. United States, 199 U. S. 547, 26 Sup. Ct. 147, 50 L. Ed. 303. Shortly afterwards, the Supreme Court rendered its decision in the Hodges Case. The atrocity of this mob attracted attention throughout the country at the time. Public attention was again directed to the case by the refusal of the Circuit Court to discharge Riggins on habeas corpus. His appeal brought the constitutional questions here before the Supreme Court, challenging its attention and judgment. They were before it in imposing form, and it determined not to pass upon them, because they were not properly presented. All these circumstances, suggested to the minds of the justices at the very time the Hodges Case was under advisement, and when it was decided, consideration of the effects of its remarks in that case, regarding the fourteenth amendment, upon all other cases where there had not been actual denial of the right by the state. It would be hazardous for this court, in view of the circumstances to hold that these remarks were made without consideration of their effect upon other cases of the kind. If they were not inadvertently made, and the court intended to bind itself on this point, it is the duty of this court to follow unhesitatingly. While there may be doubt as to what it intended, the Supreme Court is the only court which can properly solve that doubt. If this court solves its own doubts as to the meaning of the Supreme Court against the defendant, and puts him to trial, and it turns out that this court is mistaken, it will inflict needless hardship upon the defendant, and put the government to much useless expense. On the other hand, if the court errs in solving its doubts against the government, it has a speedy remedy on writ of error from the Supreme Court, under a recent act of Congress. A deep sense of the judicial

subordination which all inferior tribunals owe to the Supreme Court compels this court, in view of the circumstances of this case, not to run counter to these last utterances of the Supreme Court, though, strictly speaking, they "went beyond the case." It must therefore take the Hodges Case as a binding authority that no right, privilege, or immunity in respect of due process, at any stage in the duty of affording it, arises under the fourteenth amendment, unless there be denial of the right by the state or its officers, and that no immunity whatever is secured under the Constitution or laws, in a case like this, against lawlessness of private individuals which frustrates the state's efforts to perform its constitutional duty, although thereby all enjoyment of the benefits of due process be prevented.

Let an order be entered sustaining the demurrer to the indictment and each count thereof, and that the defendant go hence without day.