UNITED STATES *v.* WILLIAMS ET AL.

No. 26.   Argued January 8, 1951.—Decided April 23, 1951.

*Philip Elman* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General McInerney* and *Sydney Brodie.*

*John D. Marsh* argued the cause for Ford, appellee, and filed a brief for Ford et al., appellees. With him on the brief was *Bart A. Riley* for Williams, appellee.

MR. JUSTICE FRANKFURTER announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE, MR. JUSTICE JACKSON and MR. JUSTICE MINTON joined.

In 1947 a Florida corporation employed a detective agency to investigate thefts of its property. The inquiry was conducted by one Williams, the head of the agency, and among the participants were two of his employees and a member of the Miami police force detailed to assist in the investigation. Certain of the company's employees fell under suspicion; and Williams and his collaborators, without arresting the suspects, took them one by one to a shack on the company's premises. There the investigators subjected them to the familiar "third-degree" which, after blows, kicks, threats, and prolonged exposure to a brilliant light, yielded "confessions."

Williams and the other three were thereupon indicted for violation of §§ 19 and 20 of the Criminal Code of the United States. 18 U. S. C. (1946 ed.) §§ 51 and 52, now 18 U. S. C. §§ 241 and 242. Williams was convicted under § 20, the indictment alleging that he "wilfully, under color of the laws, statutes, ordinances, regulations and customs of the State of Florida . . . subjected . . . an inhabitant of the State of Florida, to deprivation of the rights, privileges and immunities secured to him and protected by the Fourteenth Amendment . . . ." This conviction is reviewed in No. 365, *post,* p. 97, also decided this day. The other defendants were acquitted of the charges under § 20, and as to all defendants a

mistrial was declared under § 19. This outcome of the indictment under §§ 19 and 20 was followed by a new indictment against the four defendants under § 19. The indictment alleged that "acting under the laws of the State of Florida" the defendants "conspired to injure . . . a citizen of the United States and of the State of Florida, in the free exercise and enjoyment of the rights and privileges secured to him and protected by the Fourteenth Amendment . . . ." This time all the defendants were convicted; but on appeal the Court of Appeals for the Fifth Circuit reversed. It held that in the conspiracy provision of § 19 "the Congress had in mind the federal rights and privileges which appertain to citizens as such and not the general rights extended to all persons by the clause of the Fourteenth Amendment." 179 F. 2d 644, 648. In the alternative, the court concluded that a broader construction of § 19 would render it void for indefiniteness, and that there was error in the judge's charge as well as in the exclusion of evidence of the prior acquittal of three of the defendants. Together with Nos. 134 and 365 of this Term, the other two cases growing out of the same affair, we brought the case here because important questions in the administration of civil rights legislation are raised. 340 U. S. 849.

The alternative grounds for the decision of the Court of Appeals need not be considered, for we agree that § 241 (to use the current designation for what was § 19 of the Criminal Code) does not reach the conduct laid as an offense in the prosecution here. This is not because we deny the power of Congress to enforce by appropriate criminal sanction every right guaranteed by the Due Process Clause of the Fourteenth Amendment; nor is it because we fully accept the course of reasoning of the court below. We base our decision on the history of § 241, its text and context, the statutory framework in which it stands, its practical and judicial application—controlling

elements in construing a federal criminal provision that affects the wise adjustment between State responsibility and national control of essentially local affairs. The elements all converge in one direction. They lead us to hold that § 241 only covers conduct which interferes with rights arising from the substantive powers of the Federal Government.

What is now known as § 241 originated as § 6 of the Act of May 31, 1870, 16 Stat. 140. That statute was entitled "An Act to enforce the Right of Citizens of the United States to vote in the several States of this Union, and for other Purposes." In furtherance of its chief end of assuring the right of Negroes to vote, it provided in §§ 2 and 3 that it should be a misdemeanor for any "person or officer" wrongfully to fail in a duty imposed on him by State law to perform or permit performance of acts necessary to registering or voting. In § 4 interference with elections by private persons was made a similar offense. In the course of passage through Congress several sections were added which had a larger purpose. One of them, § 17, was derived from the Civil Rights Act of 1866, 14 Stat. 27, and was designed to "secure to all persons the equal protection of the laws." [1] It imposed imprisonment up to one year and a fine up to one thousand dollars on

> "any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens . . . ." 16 Stat. 140, 144.

---

[1] See the remarks of Senator Stewart at the time he proposed the amendment, Cong. Globe, 41st Cong., 2d Sess. 3480 (1870).

74

Through successive revisions it has become § 242, the application of which to the facts before us is considered in No. 365, *post,* p. 97.

Another of the broader provisions is the section which is our immediate concern. This was its original form:

> "SEC. 6. *And be it further enacted,* That if two or more persons shall band or conspire together, or go in disguise upon the public highway, or upon the premises of another, with intent to violate any provision of this act, or to injure, oppress, threaten, or intimidate any citizen with intent to prevent or hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the Constitution or laws of the United States, or because of his having exercised the same, such persons shall be held guilty of felony, and, on conviction thereof, shall be fined or imprisoned, or both, at the discretion of the court,—the fine not to exceed five thousand dollars, and the imprisonment not to exceed ten years,—and shall, moreover, be thereafter ineligible to, and disabled from holding, any office or place of honor, profit, or trust created by the Constitution or laws of the United States." 16 Stat. 140, 141.

The dominant conditions of the Reconstruction Period were not conducive to the enactment of carefully considered and coherent legislation. Strong post-war feeling caused inadequate deliberation and led to loose and careless phrasing of laws relating to the new political issues. The sections before us are no exception. Although enacted together, they were proposed by different sponsors and hastily adopted. They received little attention in debate. While the discussion of the bill as a whole fills about 100 pages of the Congressional Globe, only two or three related to § 6, and these are in good part

a record of complaint that the section was inadequately considered or understood.[2]

Nevertheless some conclusions are warranted. The first is that interference with civil rights by State officers was dealt with fully by § 17 of the Act. Three years before its enactment Congress had passed the first general conspiracy statute. Act of March 2, 1867, § 30, 14 Stat. 484; R. S. § 5440; now 18 U. S. C. § 371. This provision, in conjunction with § 17, reached conspiracies under color of State law to deprive persons of rights guaranteed

---

[2] Sections 2, 3, and 4 appeared in the bill as it was first introduced into the Senate. Cong. Globe, 41st Cong., 2d Sess. 3480 (1870). Section 17 was proposed by Senator Stewart at the outset of the debate. *Ibid.* Section 6 was subsequently proposed by Senator Pool. *Id.,* 3612.

The debate of the Senate, which considered the Act as in Committee of the Whole, is found between pp. 3479 and 3808 of the Congressional Globe. Illustrative of the discussion of the consideration given the Act are these remarks of Senator Casserly:

"One of the worst provisions of the bill as it passed this body and as it went to the committee of conference, was a provision which escaped the notice of nearly every one of the minority of this body, and I verily believe of a very considerable portion of the majority of the Senators in this body. I refer to those provisions which were taken out of a bill for the enforcement of the fourteenth amendment.

"Now, is it a fit thing that legislation of that importance should go through the American Congress unknown to those members who had taken the greatest interest in informing themselves, as well as to that large body of other members whose right it was to know upon what they were voting? . . . I shall not undertake to show how far the course of the majority, in forcing the Senate bill through to a final vote at a midnight session of unusual duration, without the least public demand or exigency for such a proceeding, contributed to such a result; how far it contributed to the making, to the enacting into a law of provisions which were not supposed or understood by a considerable portion of the body to be in the bill that was before it." *Id.,* 3759. See also the remarks of Senators Thurman and Stewart, *id.,* 3672, 3808. The House devoted very little attention to the Act. See *id.,* 1812, 3503, 3853, 3871.

by the Fourteenth Amendment. No other provision of the Act of 1870 was necessary for that purpose.

The second conclusion is that if language is to carry any meaning at all it must be clear that the principal purpose of § 6, unlike § 17, was to reach private action rather than officers of a State acting under its authority. Men who "go in disguise upon the public highway, or upon the premises of another" are not likely to be acting in official capacities. The history of the times—the lawless activities of private bands, of which the Klan was the most conspicuous—explains why Congress dealt with both State disregard of the new constitutional prohibitions and private lawlessness.[3] The sponsor of § 6 in the Senate made explicit that the purpose of his amendment was to control private conduct.[4]

---

[3] The depth of feeling which the lawlessness of the period evoked is reflected in the letter of Chief Justice Thomas Ruffin to his son, July 8, 1869. See 4 Hamilton, The Papers of Thomas Ruffin, 225.

[4] In introducing the provisions Senator Pool said,

"There are, Mr. President, various ways in which the right secured by the fifteenth amendment may be abridged by citizens in a State. If a State should undertake by positive enactment, as I have said, to abridge the right of suffrage, the courts of the country would prevent it; and I find that in section two of the bill which has been proposed as a substitute by the Judiciary Committee of the Senate provision is made for cases where officers charged with registration or officers charged with the assessment of taxes and with making the proper entries in connection therewith, shall refuse the right to register or to pay taxes to a citizen. . . . But, sir, individuals may prevent the exercise of the right of suffrage; individuals may prevent the enjoyment of other rights which are conferred upon the citizen by the fourteenth amendment, as well as trespass upon the right conferred by the fifteenth. Not only citizens, but organizations of citizens, conspiracies, may be and are, as we are told, in some of the States formed for that purpose." *Id.,* 3611.

The only other pertinent remarks of the Senator are these:

"I believe that the United States has the right, and that it is an incumbent duty upon it, to go into the States to enforce the rights of the citizens against all who attempt to infringe upon those rights

These two conclusions strongly suggest a third: that the rights which § 6 protects are those which Congress can beyond doubt constitutionally secure against interference by private individuals. Decisions of this Court have established that this category includes rights which arise from the relationship of the individual and the Federal Government. The right of citizens to vote in congressional elections, for instance, may obviously be protected by Congress from individual as well as from State interference. *Ex parte Yarbrough,* 110 U. S. 651. On the other hand, we have consistently held that the category of rights which Congress may constitutionally protect from interference by private persons excludes those rights which the Constitution merely guarantees from interference by a State. Thus we held that an individual's interest in receiving a fair trial in State courts cannot be constitutionally vindicated by federal prosecution of private persons. *United States* v. *Powell,* 212 U. S. 564; accord, *Hodges* v. *United States,* 203 U. S. 1; *United*

when they are recognized and secured by the Constitution of the country. . . .

"Mr. President, the liberty of a citizen of the United States, the prerogatives, the rights, and the immunities of American citizenship, should not be and cannot be safely left to the mere caprice of States either in the passage of laws or in the withholding of that protection which any emergency may require. If a State by omission neglects to give to every citizen within its borders a free, fair, and full exercise and enjoyment of his rights it is the duty of the United States Government to go into the State, and by its strong arm to see that he does have the full and free enjoyment of those rights." *Id.,* 3613.

In both these passages the Senator states clearly that his proposals are intended to be applicable to private persons. In neither does he indicate distinctly the nature of the rights which § 6 is to protect. The phrase "rights which are conferred upon the citizen by the fourteenth amendment" does not necessarily refer to interests guaranteed by the Amendment against State action. It may be relevant only to the new federal rights created by the Amendment through conferring citizenship on persons not previously entitled to it.

*States* v. *Wheeler,* 254 U. S. 281. The distinction which these decisions draw between rights that flow from the substantive powers of the Federal Government and may clearly be protected from private interference, and interests which the Constitution only guarantees from interference by States, is a familiar one in American law. See, *e. g., Strauder* v. *West Virginia,* 100 U. S. 303, 310.

To construe § 6 so as to protect interests not arising from the relationship of the individual with the Federal Government, but only guaranteed by the Constitution from interference by the States, would make its scope duplicate the coverage of § 17 and the general conspiracy clause. That this is not in fact what Congress desired is confirmed by further examination of the text of the statute. Full allowance for hasty draftsmanship cannot obscure clear indications from the text that the category of interests protected by § 6 does not include the rights against State action secured by § 17.

Thus, when Congress wished to protect from State action interests guaranteed by the Fourteenth Amendment, it described them in § 17 as rights "secured or protected" by the Constitution. But in § 6 the narrower phrase "granted or secured" is used to define the interests protected from interference by individuals. When Congress wanted to reach action by State officers, the explicit reference in § 17 to "color" of State law demonstrates that Congress knew how to make this purpose known. Similarly, reference in §§ 2 and 3 to "persons or officers" indicates that Congress was able explicitly to draft a section applicable to persons acting in private and official capacities alike. In contrast, § 6 was made applicable simply to "persons." Nothing in its terms indicates that color of State law was to be relevant to prosecution under it.[5]

---

[5] The position of § 6 in the statute as well as its phraseology indicates that it was not intended to be a companion to § 17, and to punish conspiracies wherever that section prohibited the substantive

To find this significance in the text of the Act of 1870 is not to give undue weight to differences in phraseology appearing in the statute. For the text of these sections has been considered by Congress not once but five times. Some minor changes of phraseology were made in the course of the successive revisions. But neither the Revised Statutes of 1874–1878, nor the Criminal Code of 1909, nor the 1926 codification in the United States Code, nor the 1948 revision of the Criminal Code, indicates either in text or reviser's commentary any change in substance. The continuity of meaning is indicated in the Appendix to this opinion, *post,* p. 83.

In three of the revisions, furthermore, Congress had before it a consistent course of decisions of this Court indicating that § 6—now § 241—was in practice interpreted only to protect rights arising from the existence and powers of the Federal Government. The pattern was established by *United States* v. *Cruikshank,* 92 U. S. 542. The defendants were indicted for conspiring to deprive some Negro citizens of rights secured by the Constitution. This Court affirmed the decision of the Circuit Court arresting judgment entered on a verdict of guilty. It found that counts alleging interference with rights secured by the First, Second, Fourteenth and Fifteenth Amendments were objectionable because the rights asserted were not "granted or secured by the constitution or laws of the United States" within the meaning of the statute. 92 U. S. at 551. The pattern set by this case has never been departed from.

*Ex parte Yarbrough,* 110 U. S. 651, was the first of seven decisions in which the Court held or assumed that the

---

offense. It is likewise clear that § 6 was not intended to apply the provisions of § 17 to private persons in the sense that § 4 supplements §§ 2 and 3. The location of § 6 in the statute to the contrary confirms that its purpose and coverage are distinct from the other provisions of the law.

right to vote in federal elections was protected by this legislation because it was a right "granted or secured" by the Constitution or laws of the United States. *Guinn* v. *United States,* 238 U. S. 347; *United States* v. *Mosley,* 238 U. S. 383; and *United States* v. *Saylor,* 322 U. S. 385, held that interference by private persons with the right to vote in general elections for members of Congress is an offense under § 241; in *United States* v. *Classic,* 313 U. S. 299, the statute was found applicable to the Louisiana system of primary elections for Congress.[6]

In *United States* v. *Waddell,* 112 U. S. 76, interference with the right to establish a claim under the Homestead Acts brought the offender within § 241. The right did not pertain to United States citizenship; but since it was "wholly dependent upon the act of Congress," obstructing its exercise came "within the purview of the statute and of the constitutional power of Congress to make such statute." 112 U. S. at 79, 80. Similarly, the Court has held that assault upon a citizen in the custody of a United States marshal is a violation of the statute, *Logan* v. *United States,* 144 U. S. 263. And so, a citizen may not be denied the right to inform on violation of federal laws. *In re Quarles,* 158 U. S. 532; *Motes* v. *United States,* 178 U. S. 458.

Contrariwise, we have held that conspiracies to force citizens to give up their jobs or compel them to move out of a State are not within the terms of the statute. *Hodges* v. *United States,* 203 U. S. 1; *United States* v. *Wheeler,* 254 U. S. 281. And in *United States* v. *Powell,* 212 U. S. 564, we held that participants in a mob which seized a

---

[6] The two other decisions involving elections found the indictments wanting because what was charged was not deemed to constitute an effective interference with the exercise of a voter's federal franchise. *United States* v. *Gradwell,* 243 U. S. 476; *United States* v. *Bathgate,* 246 U. S. 220.

Negro from the custody of the local sheriff and lynched him were not indictable under § 241.[7]

In none of these decisions was the precise issue before us decided, for in none was it alleged that the defendants acted under color of State law. But the validity of a conviction under § 241 depends on the scope of that section, which cannot be expanded by the draftsman of an indictment. The uses to which a statute has been put are strong evidence of the ends it was intended to serve. In this instance the decisions buttress what common sense and a spontaneous reading of the statute independently make clear, and give added significance to repeated reenactment without substantial change.[8] All the evidence points to the same conclusion: that § 241 applies only to interfer-

---

[7] *Baldwin* v. *Franks*, 120 U. S. 678, held that a conspiracy to drive aliens from their homes is not an offense under the statute, since it is expressly limited to interference with citizens. In three other decisions of this Court the section was involved, but no question pertinent to the issues now before us was decided. *United States* v. *Mason*, 213 U. S. 115; *O'Sullivan* v. *Felix*, 233 U. S. 318; *Pennsylvania System Federation* v. *Pennsylvania R. Co.*, 267 U. S. 203.

[8] It is worth noting that count 1 of the indictment in *Screws* v. *United States*, 325 U. S. 91, laid a charge under § 51 (now § 241) similar to the indictment now here for review. There was a demurrer to that indictment on the ground that § 51 did not afford a legal basis for such a charge. The argument advanced by the Government to support count 1 was substantially the argument the Government now makes in this case. The demurrer was sustained and the Government did not challenge the District Court's interpretation of § 51, although the Criminal Appeals Act of 1907, 34 Stat. 1246, 18 U. S. C. (1946 ed.) § 682, now 18 U. S. C. § 3731, enabled the Government to secure review of that construction here.

In a few early cases this section was applied in lower courts to rights not arising from the relation of the victim to the Federal Government. See *United States* v. *Hall*, 26 Fed. Cas. 79; *United States* v. *Mall*, 26 Fed. Cas. 1147; *Ex parte Riggins*, 134 F. 404. Since in none of these decisions was it alleged that the defendants acted under color of State law, each is plainly inconsistent with subsequent decisions of this Court. They also run counter even to the arguments adduced in support of the conviction here.

ence with rights which arise from the relation of the victim and the Federal Government, and not to interference by State officers with rights which the Federal Government merely guarantees from abridgment by the States.

To reject this evidence and hold the indictment valid under § 241 not only involves a new, distorting construction of an old statute. It also makes for redundancy and confusion and raises some needless constitutional problems. For if we assume that a conspiracy such as that described here is under color of State law, it can be reached under § 242 and the general conspiracy statute. Indeed, the defendants before us were indicted and tried for violation of § 242; the conviction of one of them under that section is before us in No. 365, *post,* p. 97. Unlike § 242, the section now before us is not qualified by the requirement that the defendants have acted "willfully," and the very specialized content attributed to that word was found essential to sustaining § 242 in *Screws* v. *United States,* 325 U. S. 91. Nor does the defined crime have as an ingredient that the conspiracy be under color of State law. Criminal statutes should be given the meaning their language most obviously invites. Their scope should not be extended to conduct not clearly within their terms.

We therefore hold that including an allegation that the defendants acted under color of State law in an indictment under § 241 does not extend the protection of the section to rights which the Federal Constitution merely guarantees against abridgment by the States. Since under this interpretation of the statute the indictment must fall, the judgment of the court below is

*Affirmed.*

[For opinion of MR. JUSTICE BLACK, concurring in the result, see *post,* p. 85.]

[For dissenting opinion of MR. JUSTICE DOUGLAS, joined by MR. JUSTICE REED, MR. JUSTICE BURTON and MR. JUSTICE CLARK, see *post,* p. 87.]

| Act of April 9, 1866, 14 Stat. 27 | Act of May 31, 1870, 16 Stat. 141, 144 | Revised Statutes of 1874–1878 | Criminal Code of 1909, 35 Stat. 1092 | United States Code, 1926 Codification, 44 Stat. 462, now 1946 ed. | Title 18, United States Code, as revised in 1948 |
|---|---|---|---|---|---|
| | SEC. 6. *And be it further enacted,* That if two or more persons [shall band or] conspire [together,] or go in disguise upon the [public] highway, or upon the premises of another, with intent to [violate any provision of this act, or to] injure, oppress, threaten, or intimidate any citizen with intent to prevent or hinder his free exercise and enjoyment of any right or privilege [granted or] secured to him by the Constitution or laws of the United States, or because of his having exercised the same, such persons [shall be held guilty of felony, and, on conviction thereof,] shall be fined or imprisoned, [or both, at the discretion of the court,]—the fine not to exceed five thousand dollars, and the imprisonment not to exceed ten years,—and shall, moreover, be thereafter ineligible to, and disabled from holding, any office or place of honor, profit, or trust created by the Constitution or laws of the United States.[1] | SEC. 5508. If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars *and* imprisoned not more than ten years; and, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States.[1] | SEC. 19. If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same, or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars *and* imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States.[1] | Section 51. Conspiracy to injure persons in exercise of civil rights.—If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same, or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than $5,000 and imprisoned not more than ten years, [and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States]. | § 241. Conspiracy against rights of citizens<br><br>If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or<br><br>If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—<br><br>They shall be fined not more than $5,000 *or* imprisoned not more than ten years, *or both.* |
| SEC. 2. *And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person [having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or] by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court. | SEC. 17. *And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom, [shall] subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by *the last preceding section of this act,* or to different punishment, pains, or penalties on account of such person *being an alien, or by* reason of his color or race, than is prescribed for the punishment of *citizens,* shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, [in the discretion of the court].[2] | SEC. 5510. *Every* person who, under color of any law, statute, ordinance, regulation, or custom, subjects, or causes to be subjected, any inhabitant of any State or Territory to the deprivation of any rights, *privileges, or immunities,* secured or protected by *the Constitution and laws of the United States,* or to different punishments, pains, or penalties, on account of such *inhabitant* being an alien, or by reason of his color or race, than *are* prescribed for the punishment of citizens, shall be punished by *a* fine of not *more than* one thousand dollars, or *by* imprisonment not *more than* one year, *or by* both. | SEC. 20. *Whoever,* under color of any law, statute, ordinance, regulation, or custom, *willfully* subjects, [or causes to be subjected,] any inhabitant of any State, Territory, *or District* to the deprivation of any rights, *privileges, or immunities* secured or protected by *the Constitution and laws of the United States,* or to different punishments, pains, or penalties, on account of such *inhabitant* being an alien, or by reason of his color, or race, than *are* prescribed for the punishment of citizens, shall be *fined* not more than one thousand dollars, or *imprisoned* not more than one year, or both. | § 52. Depriving citizens of civil rights under color of State laws.—Whoever, under color of any law, statute, ordinance, regulation, or custom, *willfully* subjects, [or causes to be subjected,] any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000, or imprisoned not more than one year, or both. | § 242. Deprivation of rights under color of law<br><br>Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both. |

[1] Because of the rearrangement and simplification of the clauses of § 6 in the Revision of 1874–1878, certain changes cannot conveniently be shown by brackets and italics. They are immaterial.

[2] The rights referred to in the preceding section are "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens [and to] be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other." § 16, 16 Stat. 144.

MR. JUSTICE BLACK, concurring in the result.

This is one of three prosecutions of respondents Williams, Ford, Bombaci and Perry arising out of their alleged conduct in brutally coercing confessions from certain persons suspected of theft. The first prosecution was under an indictment charging respondents and two other defendants not now before us with violation of the substantive offense and conspiracy sections of the Civil Rights Act. 18 U. S. C. (1946 ed.) §§ 51, 52, now 18 U. S. C. §§ 241, 242. That trial resulted in conviction of respondent Williams and acquittal of the other five on the substantive counts; a mistrial was declared as to all defendants on the conspiracy counts.[1] Shortly thereafter two new indictments were returned: One again charged the six defendants with the same conspiracy; the other charged four of them with having committed perjury during their first trial.[2] On the second trial for conspiracy all were convicted and it is these convictions of respondents that we review in the present case.

I am convinced from the records before us that the principle of *res judicata* should have barred the Government from trying respondents on this second indictment for conspiracy. In the first trial the judge instructed the jury to convict on the substantive counts all defendants who either committed that crime or aided, abetted, assisted, counseled, encouraged, commanded, induced, procured or incited any other person to do so. Acquittal of

---

[1] Williams' conviction on the substantive counts is reviewed in *Williams* v. *United States*, 341 U. S. 97, decided today.

[2] The indictment charging respondents Williams, Ford and Bombaci (and one defendant not before us in the present case) with perjury is reviewed today in *United States* v. *Williams*, 341 U. S. 58. Respondents have claimed that because of the pending perjury charges the defendants refrained from testifying in the present trial for conspiracy.

the five defendants was, therefore, a final determination that they had done none of these things, or, in effect, that they had nothing to do with the commission of the substantive offense itself. The principle of *res judicata* of course precludes a relitigation of the same factual issues in any subsequent trial. *Sealfon* v. *United States,* 332 U. S. 575. This being true, the broad scope of the facts found adversely to the Government in the first trial barred a conviction of the five defendants upon the second trial because there is no evidence that they conspired except insofar as the unlawful agreement can be inferred from their having participated in some way in the substantive crime. Consequently, the conspiracy convictions cannot stand as to respondents Ford, Bombaci and Perry, these three being among those previously found not guilty of the substantive charge.

Nor should the conspiracy conviction of respondent Williams stand under these circumstances. The indictment did not allege and there was no evidence to suggest that he conspired with anyone other than the five named defendants. As a result, when the Government was precluded by *res judicata* from proving the guilt of any of Williams' alleged co-conspirators, the *basis* of the conspiracy charge as to Williams was necessarily removed since one person obviously cannot conspire with himself. Cf. *Morrison* v. *California,* 291 U. S. 82, 93; *Feder* v. *United States,* 257 F. 694; see also the cases collected in 72 A. L. R. 1180, 1186–1187; 97 A. L. R. 1312, 1313, 1316–1317.

Because, for the foregoing reasons, I believe the conspiracy convictions of respondents must fail, I find it unnecessary to determine whether 18 U. S. C. (1946 ed.) § 51, now 18 U. S. C. (1946 ed., Supp. III) § 241, as applied, is too vague and uncertain in scope to be consistent with the Fifth Amendment.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE REED, MR. JUSTICE BURTON, and MR. JUSTICE CLARK concur, dissenting.

Sections 19 and 20 of the Criminal Code, now 18 U. S. C. §§ 241 and 242, are companion sections designed for the protection of great rights won after the Nation's most critical internal conflict. Section 19 covers conspiracies; § 20, substantive offenses. Section 19 protects the "citizen"; § 20 the "inhabitant." The sanction of § 19 extends to "any right or privilege secured" to the citizen "by the Constitution or laws of the United States"; the sanction of § 20 to "any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States." [1]

Mr. Justice Rutledge in *Screws* v. *United States*, 325 U. S. 91, 119, wrote that in spite of the difference in word-

---

[1] Section 19 of the Criminal Code, 18 U. S. C. (1946 ed.) § 51, provided: "If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same, or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than $5,000 and imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States."

Section 20 of the Criminal Code, 18 U. S. C. (1946 ed.) § 52, provided: "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects, or causes to be subjected, any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000, or imprisoned not more than one year, or both."

ing of §§ 19 and 20 there are "no differences in the basic rights guarded. Each protects in a different way the rights and privileges secured to individuals by the Constitution." One would indeed have to strain hard at words to find any difference of substance between "any right or privilege secured" by the Constitution or laws of the United States (§ 19) and "any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States" (§ 20). If § 20 embraces a broader range of rights than § 19, it must be because it includes "immunities" as well as "rights" and "privileges" and "protects" them as well as "secures" them. When no major difference between §§ 19 and 20 is apparent from the words themselves, it is strange to hear it said that though § 20 extends to rights guaranteed against state action by the Fourteenth Amendment, § 19 is limited to rights which the Federal Government can secure against invasion by private persons. The division of powers between State and Nation is so inherent in our republican form of government and so well established throughout our history that if Congress had desired to draw a distinction along that line, it is hard to imagine that it would not have made its purpose clear in the language used.[2]

It is true that §§ 19 and 20 have different origins. Section 20 came into the law as § 2 of the Act of April 7, 1866, 14 Stat. 27, while § 19 first appeared as § 6 of the

[2] The suggestion that the general conspiracy statute, § 30 of the Act of March 2, 1867, 14 Stat. 484, enacted three years before § 19, was adequate to reach conspiracies under color of state law to deprive persons of Fourteenth Amendment rights and that therefore the inclusion of such rights in § 19 was not necessary bears little weight. The general conspiracy statute as originally enacted carried a penalty of not less than $1,000 and not more than $10,000 and imprisonment not exceeding 2 years. Section 19 has from the beginning carried a more severe penalty—not more than $5,000 and imprisonment not to exceed 10 years. Moreover, § 19 at the time of its enactment carried a further penalty: the persons convicted were disabled from

Act of May 31, 1870, 16 Stat. 141. We reviewed the history of § 20 in *Screws* v. *United States,* 325 U. S. 91, 98–100. The legislative history makes plain that § 20 was an antidiscrimination measure designed to protect Negroes in their newly won rights. It was enacted before the Fourteenth Amendment became effective. But after that date it was reenacted as § 17 of the Act of May 31, 1870, 16 Stat. 144; and in 1874 the prohibition against "the deprivation of any rights, privileges, or immunities, secured or protected by the Constitution and laws of the United States" was introduced. R. S. § 5510. From this history there can be no doubt, as we stated in *Screws* v. *United States, supra,* p. 100, that § 20 is "one of the sanctions to the great rights which the Fourteenth Amendment was designed to secure." If that be true— if "rights, privileges, or immunities secured or protected by the Constitution and laws of the United States" as used in § 20 are not restricted to rights which the Federal Government can secure against interference by private persons—it is difficult to understand why "any right or privilege secured to him by the Constitution or laws of the United States," as used in § 19, is so restricted.

It is true that a part of the purpose of § 19 (which, as I have said, originated as § 6 of the Act of May 31, 1870, 16 Stat. 141) was to give sanction to the right to vote which was guaranteed by the Fifteenth Amendment, recently adopted. That is made plain from the congressional debates. Cong. Globe, Pt. 4, 41st Cong., 2d Sess., pp. 3607 *et seq.* Yet the rights which § 19 protected were not confined to voting rights; and one who reads the legislative history finds no trace of a suggestion that the

holding "any office or place of honor, profit, or trust created by the Constitution or laws of the United States." Act of May 31, 1870, § 6, 16 Stat. 141. The penalty of the general conspiracy statute has only recently been increased. See 18 U. S. C. (1946 ed., Supp. III) § 371, reviser's note.

broadening of the language of § 19 to include "any right or privilege secured" by the Constitution or laws of the United States was aimed only at those rights "secured" by the Federal Government against invasion by private persons.

The distinction now urged has not been noticed by students of the period. Thus Flack, in Adoption of the Fourteenth Amendment (1908), p. 223, wrote, "The bill as passed by the Houses was signed by the President May 31, 1870, and so became a law, and was, therefore, the first law for the enforcement of the Fourteenth and Fifteenth Amendments." And see Mr. Justice Roberts in *Hague* v. *C. I. O.,* 307 U. S. 496, 510. If the drastic restriction now proposed for § 19 had been part of the architectural scheme for the Act of May 31, 1870, it is difficult to imagine that some trace of the purpose would not have been left in the legislative history. What we find points indeed the other way. Senator Pool of North Carolina, who introduced the section from which § 19 evolved, indicated that it was his purpose to extend the protection of the new provision to the Fourteenth as well as to the Fifteenth Amendment.[3] It has, indeed,

---

[3] After discussing the Thirteenth, Fourteenth, and Fifteenth Amendments he said, "I believe that we have a perfect right under the Constitution of the United States, not only under these three amendments, but under the general scope and features and spirit of the Constitution itself, to go into any of these States for the purpose of protecting and securing liberty. I admit that when you go there for the purpose of restraining liberty, you can go only under delegated powers in express terms; but to go into the States for the purpose of securing and protecting the liberty of the citizen and the rights and immunities of American citizenship is in accordance with the spirit and whole object of the formation of the Union and the national Government.

"There are, Mr. President, various ways in which the right secured by the fifteenth amendment may be abridged by citizens in a State. . . . I believe the language of the Senate bill is sufficiently large

long been assumed that § 19 had a coverage broad enough to include all constitutional rights. Thus in *United States* v. *Mosley*, 238 U. S. 383, 387, Mr. Justice Holmes

and comprehensive to embrace any other class of officers that might be charged with any act that was necessary to enable a citizen to perform any prerequisite to voting. But, sir, individuals may prevent the exercise of the right of suffrage; individuals may prevent the enjoyment of other rights which are conferred upon the citizen by the fourteenth amendment, as well as trespass upon the right conferred by the fifteenth. Not only citizens, but organizations of citizens, conspiracies, may be and are, as we are told, in some of the States formed for that purpose. I see in the fourth section of the Senate bill a provision for cases where citizens by threats, intimidation, bribery, or otherwise prevent, delay, or hinder the exercise of this right; but there is nothing here that strikes at organizations of individuals, at conspiracies for that purpose. . . .

.     .     .     .     .

"That the United States Government has the right to go into the States and enforce the fourteenth and the fifteenth amendments is, in my judgment, perfectly clear, by appropriate legislation that shall bear upon individuals. I cannot see that it would be possible for appropriate legislation to be resorted to except as applicable to individuals who violate or attempt to violate these provisions. Certainly we cannot legislate here against States. As I said a few moments ago, it is upon individuals that we must press our legislation. It matters not whether those individuals be officers or whether they are acting upon their own responsibility; whether they are acting singly or in organizations. If there is to be appropriate legislation at all, it must be that which applies to individuals.

.     .     .     .     .

"Mr. President, the liberty of a citizen of the United States, the prerogatives, the rights, and the immunities of American citizenship, should not be and cannot be safely left to the mere caprice of States either in the passage of laws or in the withholding of that protection which any emergency may require. If a State by omission neglects to give to every citizen within its borders a free, fair, and full exercise and enjoyment of his rights it is the duty of the United States Government to go into the State, and by its strong arm to see that he does have the full and free enjoyment of those rights." Cong. Globe, 41st Cong., 2d Sess., pp. 3611, 3613.

observed that § 19 "dealt with Federal rights and with all Federal rights."

There is no decision, prior to that of the Court of Appeals in this case, which is opposed to that view. Fourteenth Amendment rights have sometimes been asserted under § 19 and denied by the Court. That was true in *United States* v. *Cruikshank,* 92 U. S. 542. But the denial had nothing to do with the issues in the present case. The Fourteenth Amendment protects the individual against *state action,* not against wrongs done by *individuals.* See *Civil Rights Cases,* 109 U. S. 3; *Shelley* v. *Kraemer,* 334 U. S. 1. The *Cruikshank* case, like others,[4] involved wrongful action by *individuals* who did not act for a state nor under color of state authority. As the Court in the *Cruikshank* case said, "The fourteenth amendment prohibits a State from denying to any person within its jurisdiction the equal protection of the laws; but this provision does not, any more than the one which precedes it . . . add any thing to the rights which one citizen has under the Constitution against another." 92 U. S. at pp. 554–555. There is implicit in this holding, as Mr. Justice Rutledge observed in the *Screws* case, *supra,* p. 125, note 22, that wrongful action by state officials would bring the case within § 19. For the Court in the *Cruikshank* case stated, "The only obligation resting upon the United States is to see that the States do not deny the right. This the amendment guarantees, but no more. The power of the national government is limited to the enforcement of this guaranty."

Section 19 has in fact been applied to the protection of rights under the Fourteenth Amendment. See *United States* v. *Hall,* 26 Fed. Cas. 79; *United States* v. *Mall,* 26

---

[4] See *Hodges* v. *United States,* 203 U. S. 1, 14; *United States* v. *Powell,* 151 F. 648, aff'd, 212 U. S. 564; *United States* v. *Wheeler,* 254 U. S. 281, 298.

Fed. Cas. 1147; *Ex parte Riggins,* 134 F. 404, writ dismissed, 199 U. S. 547. Those attempts which failed did so not because § 19 was construed to have too narrow a scope, but because the action complained of was *individual* action, not *state* action. See, *e. g., United States* v. *Powell,* 151 F. 648, aff'd, 212 U. S. 564; *Powe* v. *United States,* 109 F. 2d 147.

While it is true, as Mr. Justice Rutledge stated in the *Screws* case, that there is no difference between §§ 19 and 20 so far as the "basic rights guarded" are concerned, the coverage of the two sections is not coterminous. The difference is not merely in the fact that § 19 covers conspiracies and § 20 substantive offenses. Section 20 extends only to those who act "under color" of law, while § 19 reaches "two or more persons" who conspire to injure any citizen in the enjoyment of any right or privilege secured to him by the Constitution, etc. The reach of § 20 over deprivations of rights protected from invasion by private persons is therefore in this one respect less than that of § 19. But that is no comfort to respondents in the present case. It certainly cannot be doubted that state officers, or those acting under color of state law, who conspire to wring confessions from an accused by force and violence, are included in "two or more persons" within the meaning of § 19. As we hold in No. 365, *Williams* v. *United States, post,* p. 97, decided this day, such an act deprives the accused of the kind of trial which the Fourteenth Amendment guarantees. He is therefore denied the enjoyment of that right, within the meaning of § 19.

In *Screws* v. *United States, supra,* we relieved § 20 of the risk of unconstitutionality by reason of vagueness. We held that "a requirement of a specific intent to deprive a person of a federal right made definite by decision or other rule of law saves the Act from any charge of unconstitutionality on the grounds of vagueness." 325 U. S. at

p. 103. The same analysis does like service here, as evidenced both by the construction of § 19 and the charge to the jury in this case.

A conspiracy by definition is a criminal agreement for a specific venture. It is "a partnership in crime." *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 253. As stated by Mr. Justice Holmes in *Frohwerk* v. *United States*, 249 U. S. 204, 209, an "intent to accomplish an object cannot be alleged more clearly than by stating that parties conspired to accomplish it." The trial court in its charge to the jury followed the ruling in the *Screws* case and gave precise application to this concept in avoidance of any claim of unconstitutionality of § 19 on the grounds of vagueness. The court, after explaining to the jury what rights, enumerated in the indictment, were guaranteed under the Fourteenth Amendment, gave numerous charges on the element of intent. The following is typical:

> "In order to convict under this indictment, it is necessary for the jury to find that the defendants had in mind the specific purpose of depriving the complaining witnesses of those rights guaranteed them under the Fourteenth Amendment to the Constitution of the United States, which are enumerated in the indictment, while acting under color of the laws of the State of Florida.

> "The proof, if any, of a general intent to do the complaining witnesses a wrong is not sufficient, but a specific intent to deprive them of a Constitutional right, as the object of the conspiracy, if any, is a burden the law casts upon the Government. In considering whether the defendants had such specific intent, you may take into consideration all the circumstances of the case in the light of the evidence as it has been developed."

In view of the nature of the conspiracy and charge to the jury in the instant case, it would be incongruous to strike § 19 down on the grounds of vagueness and yet sustain § 20 as we did in the *Screws* case.

The defense of *res judicata* is based on the acquittal of five of the respondents for violation of § 20—the substantive offense. It is argued that there is no evidence that the five conspired except insofar as the unlawful agreement can be inferred from their having participated in some way in the substantive crime. It is further argued that acquittal on the substantive counts was a determination that the five had nothing to do with the commission of the substantive offense. The conclusion therefore is that their conviction of the conspiracy entailed a relitigation, in violation of the principles of *Sealfon* v. *United States,* 332 U. S. 575, of the factual issues involved in the prior trial.

The argument, however, is too facile for the facts.

*First.* The substantive crime was one of aiding and abetting. That offense has "a broader application" than conspiracy. "It makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy." *Nye & Nissen* v. *United States,* 336 U. S. 613, 620. Respondents may have conspired to do the act without actually aiding in its commission. In other words, the crimes are different.

*Second.* In the *Sealfon* case the jury's acquittal of the first offense necessarily constituted a rejection of the only evidence presented at the second trial and upon which conviction of the record offense depended. That was not true here. The acquittals on the substantive charges by no means established that the jury rejected all the evidence against the defendants. For example, the acquittals of the substantive offense may have been on the ground that the evidence showed no giving of actual aid to Williams when he obtained the confessions by force and violence.

The evidence, though insufficient to show that the five participated in the execution of the project, could nonetheless make overwhelmingly clear that they were members of the conspiracy that conceived it.

The links that tied respondents to the conspiracy are therefore not necessarily those that the jury rejected in the earlier trial. Accordingly the rule of *Sealfon* v. *United States, supra,* has no application.