**UNITED STATES of America, Plaintiff,**

**v.**

**Jeffrey OTHERSON; Bruce Brown; Dirk Dick; and Daniel R. Charest, Defendants.**

**No. Crim. 79–682–T.**

United States District Court,
S. D. California.

Dec. 13, 1979.

Michael H. Walsh, U. S. Atty., David C. Doyle, Asst. U. S. Atty., San Diego, Cal., for plaintiff.

J. William Beard, Jr., La Jolla, Cal., Nelson P. Brav, Michael J. McCabe, Joseph A. Milchen, San Diego, Cal., for defendants.

## ORDER DEFINING "INHABITANT" AS USED IN 18 U.S.C. § 242

TURRENTINE, District Judge.

The defendants in this case are four United States Border Patrol agents who are accused of depriving certain aliens of their civil rights in violation of Title 18 U.S.C. Section 242.[1] The accusation arises out of incidents on July 3 and 4, 1979, in which the defendants allegedly mistreated and assaulted several illegal entrants whom the defendants had apprehended on the United States side of the United States-Mexico border. The defendants contend that the victims were not "inhabitants of any State, Territory or District" within the meaning of 18 U.S.C. § 242.

A thorough search of the case law by the parties and this court reveals no cases defining or interpreting the word "inhabitant" as used by this section. The Congressional intent as revealed by the legislative history of this statute, and an analysis of the policies involved, lead this court to conclude that the victims were indeed "inhabitants" of the United States within the meaning of this statute.

The word "inhabitant" has several meanings in law, depending on the context.[2] In some contexts it is equated with citizenship, see, e. g., Edgewater Realty Co. v. Tennessee Coal, Iron & Railroad Co., 49 F.Supp. 807, 809 (D.Md.1943); in other contexts,

---

1. 18 U.S.C. § 242 reads:

    Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.

2. Compare Barney v. Oelrichs, 138 U.S. 529, 533, 11 S.Ct. 414, 34 L.Ed. 1037 (1891) with Walnut v. Wade, 103 U.S. 683, 26 L.Ed. 526 (1880) and Harding v. Standard Oil, 182 F. 421, 425 (C.C.Ill.1910) and Willingham v. Swift & Co., 165 F. 223, 224 (C.C.Ga.1908) and In re Ainscow's Estate, 27 Del.Ch. 423, 34 A.2d 593 (1943), rev'd on dif. grounds, Ainscow v. Alexander, 28 Del.Ch. 545, 39 A.2d 54 (1944).

specifically that of the federal civil rights acts passed during Reconstruction,[3] "inhabitant" has explicitly been held *not* to mean "citizen." *Baldwin v. Franks,* 120 U.S. 678, 690–692, 75 S.Ct. 656, 32 L.Ed. 766 (1887). Some courts hold that the word "inhabitant" implies permanency, *e. g., Van Tassel Real Estate & Livestock Co. v. City of Cheyenne,* 49 Wyo. 333, 54 P.2d 906, 916 (1935), cert. denied 299 U.S. 574, 57 S.Ct. 38, 81 L.Ed. 423 and connotes the opposite of a transient or sojourner. *Bicycle Stepladder Co. v. Gordon,* 57 F. 529, 531 (C.C.Ill.1893). Other courts hold that "inhabitant" is synonymous with "domiciliary." *E. g., Burch v. Burch,* 195 F.2d 799, 804 (3rd Cir. 1952); *Sprague v. Sprague,* 131 N.J.Eq. 104, 23 A.2d 810 (1942). Under the latter approach, the victims herein arguably would be "inhabitants."[4]

The present concern, of course, is with the meaning of "inhabitant" in the context of the Reconstruction civil rights legislation. After a comprehensive analysis of the intent of the Congress which drafted this legislation,[5] this court holds that the word "inhabitant" describes any person who is within the jurisdiction of the United States.

Initially, this result seems incongruous when 18 U.S.C. § 242 is compared with 42 U.S.C. § 1983,[6] which grants a civil cause of action for violation of the civil rights of any "*person* within the jurisdiction of the United States." (Emphasis added.) Arguably, had Congress desired the criminal section to extend the same protection, both statutes would have contained the same language. However, such a reading of these statutes is not justified for six reasons.

---

**3.** These acts are presently codified as 18 U.S.C. §§ 241–243 and 42 U.S.C. §§ 1981–1992, 1994.

**4.** The law is well-established that a person acquires a legal "domicile" when he is physically present in a location with the intent to remain for the indefinite future. *Restatement (Second) of Conflict of Laws,* § 15 (1971). The aliens seemingly had the requisite intent. As for the requirement of physical presence, it has been held that the presence of illegal aliens is sufficient to enable them to establish a legal "domicile." *Rzeszotarski v. Rzeszotarski,* 296 A.2d 431 (D.C.App.1972); *Seren v. Douglas,* 30 Colo. App. 110, 489 P.2d 601 (1971). A fugitive from justice can establish a legal "domicile" where he is in hiding. *Young v. Pollak,* 85 Ala. 439, 5 So. 279 (1888). Additionally, many cases hold that the individual need only be present for a moment. *E. g., Winans v. Winans,* 205 Mass. 388, 91 N.E. 394, 28 L.R.A. 992 (1910); *White v. Tennant,* 31 W.Va. 790, 8 S.E. 596, 13 Am. St.R. 896 (1888); *Restatement (Second) of Conflict of Laws,* § 16 (1971).

**5.** Reliance upon the legislative history is clearly justified in this case. The word "inhabitant" is inherently ambiguous, as noted above. It is even more ambiguous in the context of the Reconstruction civil rights acts, as some of these acts protect "persons," *e. g.* 42 U.S.C. § 1983, others protect "citizens," *e. g.,* 18 U.S.C. § 241, and others protect "inhabitants," *e. g.,* 18 U.S.C. § 242. It is a cardinal rule of statutory construction that where a word or phrase is ambiguous, resort to legislative history is appropriate. *E. g., United Shoe Workers of America, AFL–CIO v. Bedell,* 165 U.S.App. D.C. 113, 506 F.2d 174 (D.C.Cir.1974). Moreover, a court should look to the legislative his-

tory to attempt to discern Congressional intent even if the words of the statute appear to be perfectly clear. *Train v. Colorado Pub. Int. Research Group,* 426 U.S. 1, 10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976); *United States v. American Trucking Assns.,* 310 U.S. 534, 543–544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). The Supreme Court has frequently admonished courts to look to the intent behind a statute and to avoid literal readings. *E. g., Lynch v. Overholser,* 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 36 L.Ed. 226 (1892); *Markham v. Cabell,* 326 U.S. 404, 409, 66 S.Ct. 193, 90 L.Ed. 165 (1945). Moreover, this approach applies to criminal statutes as well as civil statutes. *E. g., United States v. Brown,* 333 U.S. 18, 25–26, 68 S.Ct. 376, 92 L.Ed. 442 (1948); *Rainwater v. United States,* 356 U.S. 590, 592–593, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958). "Although penal laws are to be construed strictly, they 'ought not to be construed so strictly as to defeat the obvious intention of the legislature.'" *Huddleston v. United States,* 415 U.S. 814, 831, 94 S.Ct. 1262, 1272, 39 L.Ed.2d 782 (1974).

**6.** 42 U.S.C. § 1983 reads:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

First, the Reconstruction civil rights statutes are noted for their imprecise use of language. As the Supreme Court has written:

> The dominant conditions of the Reconstruction period were not conducive to the enactment of carefully considered and coherent legislation. Strong postwar feelings caused inadequate deliberation and led to loose and careless phrasing of laws relating to the new political issues. The sections before us [including what is now 18 U.S.C. § 242] are no exception. Although enacted together, they were proposed by different sponsors and hastily adopted. They received little attention in debate. *United States v. Williams,* 341 U.S. 70, 74, 71 S.Ct. 581, 583, 95 L.Ed. 758 (1950)

One congressman remarked in the House that the word "inhabitant" had actually been printed by mistake.[7] Representative Shellabarger, chairman of the House Select Committee which drafted the civil rights legislation, stated his hope that the courts would construe the civil rights acts "liberally and beneficiently" so as to grant the maximum possible protection of civil rights, and to give the "largest latitude consistent with the words employed."[8] This court is therefore unwilling to give "undue weight to differences in phraseology appearing in the [civil rights] statute." *United States v. Williams, supra,* at 79, 71 S.Ct. at 585.

■ Second, a review of the treaty between the United States and Mexico which existed when these statutes were passed, and the Convention of American Republics on the Status of Aliens which is currently in force, indicate that the word "inhabitant" should be construed so as to protect newly-arrived aliens. The Treaty of Amity, Commerce, and Navigation,[9] which was in force during the Reconstruction period, bound the United States to protect Mexican citizens who were either "transient or dwelling" within the United States. Moreover, the treaty provided:

> . . . the citizens of either party, or their agents, shall enjoy, in every respect, the same rights and privileges, either in prosecuting or defending their rights of person or of property, as the citizens of the Country where the cause may be tried.[10]

Currently, the United States and several Latin American countries whose citizens have been apprehended for illegal entry are parties to the Convention of American Republics on the Status of Aliens.[11] This Convention provides:[12]

> States should extend to foreigners, domiciled or in transit through their territory, all individual guaranties extended to their own nationals, and the enjoyment of essential civil rights without detriment, as regards foreigners, to legal provisions governing the scope of and usages for the exercise of said rights and guaranties.

The law is clear that treaties are the supreme law of the land, and are deemed to be in force unless clearly abrogated by Congress. *Torres v. I.N.S.,* 602 F.2d 190, 195 (7th Cir. 1979); *See Menominee Tribe of Indians v. United States,* 391 U.S. 404, 412–413, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Cook v. United States,* 288 U.S. 102, 120, 53 S.Ct. 305, 77 L.Ed. 641 (1933). As the mere use of the word "inhabitant" is certainly not a clear abrogation of the Mexican treaty or a limit on the Convention on Aliens, this court will refer to the treaties in interpreting the statute.

Third, an examination of the legislative history indicates strongly that the congressmen who passed this statute actually believed that "inhabitant" was essentially synonymous with "person." 18 U.S.C. § 242 was originally passed as § 17 of the En-

---

7. Congressman Bingham, Cong.Globe, 39th Cong., 1st Sess. 1292 (1866).

8. Cong.Globe, 42 Cong., 1st Sess., H.App. 68 (1871).

9. 8 Stat. 410, 416, article 14. The treaty terminated on November 30, 1881.

10. *Id.*

11. 46 Stat. 2753.

12. *Id.,* at 2754, Article V.

forcement Act of 1870,[13] and was based on § 2 of the Civil Rights Act of 1866.[14] *Screws v. United States,* 325 U.S. 91, 98, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *United States v. Classic,* 313 U.S. 299, 327 n. 10, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). In § 2 of the 1866 Act, the word "inhabitant" was used interchangeably with the word "person." [15] When commenting on the meaning of "inhabitant" in the 1866 Act, Senator Johnson said that the Act forbade: [16]

> . . . any state in the Union to draw any distinction as between her citizens who have been there from birth or who have been residents there for *any length of time,* and *he who comes into the state now for the first time as a foreigner* ; *he becomes an "inhabitant."* If he comes from England or from any of the countries of the world and settles in the State of Illinois, *that moment* he becomes an inhabitant. . . .

Congressman Bingham, who opposed the 1866 bill on the ground that Congress lacked the Constitutional power to enact such legislation prior to the enactment of the Fourteenth Amendment, stated that if the bill passed, it should *not* distinguish "in respect to life, liberty and property between the citizen and stranger." [17] Senator Trumbull, chairman of the Senate Judiciary Committee which reported the bill, remarked

that its purpose was to "protect all *persons* in the United States in their civil rights." [18]

The legislative history regarding the passage of the Enforcement Act of 1870 and the Ku Klux Klan Act of 1871 support the view that Congress intended to protect the civil rights of any person within the United States. Upon introducing the provisions which eventually became 18 U.S.C. 242, its sponsor, Senator Stewart, explicitly stated that the bill protected all "persons." [19] He noted that the bill "simply extends to foreigners, not citizens, the protection of our laws." [20] He added: [21]

> This bill extends [the equal protection of the laws] to aliens, so that all *persons* who are in the United States shall have the equal protection of our laws. It extends the operations of the civil rights bill . . . to *all persons* within the jurisdiction of the United States.

One congressman noted that he believed that aliens were: [22]

> . . . entitled to protection. I do not think true statesmanship is to be found in oppressing any defenseless people, and I shall go as far as any man to extend protection to any people who may come here under the belief that they would be safe in person and property."

The following year, congress passed what is now 42 U.S.C. § 1983 as part of the Civil Rights Act of 1871, commonly known as the

---

**13.** 16 Stat. 144.

**14.** 14 Stat. 27. Section two of the Act reads:
That any person who, under color of any law, statute, ordinance, regulation or *custom,* shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this Act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of *white persons, shall be deemed* guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court.

**15.** *Id.*

**16.** Cong.Globe, 39th Cong., 1st Sess., p. 505 (1866) (emphasis added).

**17.** Cong.Globe, 39th Cong., 1st Sess., p. 1292 (1866).

**18.** Cong.Globe, 39th Cong., 1st Sess., p. 211; quoted in *Screws v. United States,* supra, 325 U.S. at 98, 65 S.Ct. 1031 (emphasis added).

**19.** Cong.Globe, 41st Cong., 2d Sess., p. 1536 (1870); quoted in *Screws v. United States,* supra, at 99 n.7, 65 S.Ct. 1031 (emphasis added).

**20.** *Id.*

**21.** *Id.*

**22.** Remarks of Representative Fitch, Cong. Globe, 41st Cong., 2nd Sess., 4278 (1870).

Ku Klux Klan Act.[23] As noted previously, 42 U.S.C. § 1983 explicitly protects all "persons" within the United States. Yet Representative Shellabarger, chairman of the House Select Committee which drafted the 1871 Ku Klux Klan Act, emphasized:[24]

> The model for [what is now 42 U.S.C. [§] 1983] will be found in the second section of the act of April 9, 1866, known as the 'civil rights act'. That section provides a criminal proceeding in *identically* the same case as this one provides a civil remedy . . .

As noted previously, § 2 of the 1866 Act was also the precursor of 18 U.S.C. § 242 and protected the civil rights of "inhabitants." Finally, 18 U.S.C. § 242 and 42 U.S.C. § 1983 have been judicially declared the analogues of each other, with "linguistic differences" not "thought to be substantive." *Adickes v. Kress & Co.,* 398 U.S. 144, 206, 214 n.23, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (Brennan, J., concurring in part, dissenting in part); *United States v. Price,* 383 U.S. 787, 794 n.7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

Fourth, Congress almost certainly did not contemplate any distinction between "inhabitant" and "person." In 1870, no restrictions on immigration into the United States were in force; in fact, no immigration laws at all existed in this country. *E. g., E. Harper, Immigration Laws of the United States,* 4–6 (3rd Ed. 1975). To now conclude that Congress desired to withhold protection from illegal entrants by use of the word "inhabitant" in 18 U.S.C. § 242 would thus be unfounded.

■ Fifth, in determining the scope of protection granted under the Reconstruction civil rights statutes, the Supreme Court has held that reference must be made to the Fourteenth Amendment itself, as the statutes "and the Amendment were closely related both in inception and in the objectives which Congress sought to achieve." *Hurd v. Hodge,* 334 U.S. 24, 31–33, 68 S.Ct. 847, 851, 92 L.Ed. 1187 (1948); *Screws v. United*

*States,* 325 U.S. 91, 98–100, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). The Fourteenth Amendment explicitly extends the equal protection and due process of law to all "persons." The law is well settled that these protections apply to all people within the jurisdiction of the United States, whether here legally or otherwise. *Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Wong Yang Sun v. McGrath,* 339 U.S. 33, 48–51, 70 S.Ct. 445, 94 L.Ed. 616 (1950).

Sixth, an analysis of the policy interests lead this court to conclude that 18 U.S.C. § 242 protects all persons within the United States. If the word "inhabitant" were to mean otherwise, the line drawing problems would be impossible. How long must an illegal entrant be in the United States before he becomes an "inhabitant?" If the prosecution were forced to prove the circumstances of each victim, the government would almost never be able to establish its case, as the aliens could easily be deported long before an investigation into their mistreatment could begin. In fact, that is what happened in this case.

Another strong policy concern is that this area is replete with federal interests which should be vindicated by prosecution in federal courts. The protection of civil rights, as expressed in the federal civil rights statutes, is a paramount federal concern. *See Note,* 31 *Stan.L.Rev.* 477, 501 n.125 (1979). The federal government has an interest in supervising and disciplining its agents who contravene federal policies. The federal government also needs to ensure that national immigration policies are enforced. *See Note,* 31 *Stan.L.Rev.* 1069 (1979). Lastly, United States immigration policies currently have a tremendous impact on the relations between this country and the Republic of Mexico. An elementary precept of constitutional law is that the federal government has exclusive control over foreign relations. *E. g., United States v. Arjona,* 120 U.S. 479, 483, 75 S.Ct. 628, 30 L.Ed. 728 (1887); *United States v. Elliot,* 266

---

**23.** 17 Stat. 13.

**24.** Cong.Globe, 42nd Cong., 1st Sess., App. 68 (1871) (emphasis added).

F.Supp. 318 (S.D.N.Y.1967). Hence, federal prosecution and adjudication by federal courts will properly vindicate important national interests.

■ This court therefore concludes that "inhabitants," as used in 18 U.S.C. § 242, refers to any person who is within the territorial boundaries of the United States.