**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Mary McDERMOTT and Alphonse Iannacone, Defendants–Appellants.**

**No. 766, Docket 89–1507.**

United States Court of Appeals, Second Circuit.

Argued Feb. 26, 1990.

Decided Sept. 21, 1990.

Paul Windels, Jr., (Windels, Marx, Davies & Ives, New York City, of counsel), for defendants-appellants.

Daniel A. Nardello (Otto G. Obermaier, U.S. Atty. for the S.D. of N.Y., Kerri Martin Bartlett, Asst. U.S. Atty., New York City, of counsel), for plaintiff-appellee.

Before OAKES, Chief Judge, KEARSE and WALKER, Circuit Judges.

OAKES, Chief Judge:

This is an appeal by two former New York City Transit Police officers, Mary McDermott and Alphonse Iannacone, from judgments of conviction for conspiracy to violate the constitutional rights of seven citizens by false arrest, 18 U.S.C. § 241 (1988), and for falsely arresting a non-citizen resident of New York State and thereby depriving him of his constitutional rights in violation of 18 U.S.C. § 242 (1988). Trial was before the United States District Court for the Southern District of New York, Shirley Wohl Kram, *Judge*, and the appellants were convicted on all eight counts and each sentenced to two-year terms of imprisonment. We affirm the judgments of conviction, and remand for clarification of the sentences.

During the period from May 24, 1983 to March 27, 1984, McDermott and Iannacone were partners in the Anticrime Unit of District Four of the Transit Police Department and their duty included an assignment to the Lexington Avenue IRT subway line. Counts One through Three and Five through Eight of the superseding indictment relate to appellants' arrest of the seven citizens and Count Four to the arrest of the non-citizen. Each of the arrests was made for sexual abuse on the subway, except for one case that involved an alleged attempted grand larceny and jostling. Each of the alleged sexual offenses involved the male arrestee pushing up against the back of the alleged female victim, except for one that involved a male arrestee pushing a newspaper against the alleged female victim's body.

The complaint in Count One charged that the appellants violated Wayne Dickson's constitutional rights by falsely arresting him, on May 24, 1983, for sexual abuse on the Lexington Avenue subway line. Dickson was ordered off the train, arrested, handcuffed, told that he had been seen looking at an "hispanic lady" on the train. He was then transported to the District Four office at the 14th Street subway station, and issued a Desk Appearance Ticket ("DAT") informing him of the charges against him and indicating when he was to appear in court. He was then released after two-to-four hours' detention, with the charge against him ultimately being dismissed. The police reports prepared by the appellants indicated that the alleged victim reported the supposed event and that Dickson was arrested on the victim's "complaint." Although the reports described Dickson's offense as "sex abuse," the Penal Code section listed on the reports was for attempted Grand Larceny, the charge for pickpocketing. When McDermott met with an Assistant District Attorney ("ADA"), she told him that Dickson had "prior arrests for [sexual abuse]," but in fact Dickson had no prior arrest record whatsoever. A complaint was prepared charging Dickson with sexually abusing the victim "by rubb[ing] his crotch area into [her] buttocks," and alleging further that McDermott was "informed by [the victim] that [Dickson] did not have her consent" to touch her. Both Dickson and the alleged victim testified at appellants' trial that nothing had transpired between them. Rather, the victim said that when she got off the subway at 42nd Street, McDermott identified herself as a police officer and said that she had seen someone trying to steal something from the victim's pocketbook. The victim added that she had been "very surprised" when she learned that the man arrested had in fact been charged with sexual abuse, and so had written a letter to the criminal court stating that "the incident ... didn't have nothing to do with any sexual approach," and that McDermott had told her only that somebody had tried to steal something from her pocketbook.

Count Two involved the false arrest of Alan Thomas, also at the 42nd Street stop

of the Lexington Avenue subway line, on August 17, 1983. The police report prepared by the appellants indicated that the alleged victim reported the supposed act of sexual abuse and that Thomas was arrested on the victim's "complaint." Like Dickson, Thomas was taken in handcuffs to District Four for processing and released on a DAT. The charge against him was "adjourned in contemplation of dismissal," N.Y.Crim.Proc. § 170.55 (McKinney 1982 & Supp.1990), and was ultimately dismissed. Both Thomas and the victim testified at trial that nothing had happened between them. Thomas also testified that, shortly after his arrest, he had heard Iannacone ask McDermott if the victim had "cooperated."

Counts Three and Four involved the false arrests of Byung Kim and Orrett Hall on September 16, 1983, at the 14th Street station of the Lexington Avenue subway line, for committing acts of sexual abuse on two different female victims while all were riding in a single subway car. McDermott supposedly viewed one incident and Iannacone the other. Each officer prepared a report of a supposed "bumping and rubbing" incident. Kim was handcuffed, taken to District Four, and released on a DAT; the charge against him was adjourned in contemplation of dismissal. Hall was handcuffed, taken back to District Four, and told by Iannacone that "it would be a lot easier for [him] to plead guilty." Hall refused to plead guilty, was released on a DAT, and the charge against him was ultimately dismissed. At appellants' trial, both victims said that nothing had happened to them on the subway. One victim testified that McDermott had told her that she had seen a man "exposing himself" and "rubbing against" the victim, but the victim had told McDermott that she "didn't see anything and didn't feel anything," and would not press charges. Similarly, the other victim told McDermott that she had neither seen nor felt anything and would not press charges.

Count Five involved Guilharmae Dos Santos at the 28th Street station of the Lexington Avenue line on October 5, 1983. McDermott claimed that she saw Dos San-

tos "place his left hand in [a] female's purse upon entering [the] train and then while on [the] train place his hand in [a] male['s] pocket." Iannacone told the first victim that a man had tried to pick the victim's purse, but nothing was missing from the purse and neither appellant asked the victim whether she could identify the alleged pickpocket or was willing to press charges. Iannacone and McDermott ordered the second victim off the train and asked him for his name and address, but they never asked him whether he could identify the alleged pickpocket or if he was willing to press charges. The police reports prepared by the appellants, however, indicated that the purported victims had reported the attempted thefts, could identify Dos Santos, and were willing to press charges against him. Shortly after the arrest, McDermott told the ADA that he and Iannacone had seen Dos Santos switch from the northbound to the southbound trains at 42nd Street, place his hand in one victim's purse while on the platform, and, while on the train, reach through the rear vent of the other victim's coat and put his hand into the victim's left rear pocket. The complaint charged Dos Santos with attempted Grand Larceny and Jostling, and McDermott swore to the complaint. On the advice of a lawyer, Dos Santos pleaded guilty to a disorderly conduct charge, the penalty for which was waived. He said he pleaded guilty because he did not want to go to court and lose a day's pay.

Count Six involved the arrest of Robert Young at the 14th Street station of the Lexington Avenue subway on February 2, 1984. McDermott and Iannacone ordered Young off the train and handcuffed him; when Young asked McDermott what he had done, she told him to "shut the fuck up." The police report stated that Iannacone had seen Young pressing on a victim's buttocks and that the victim had felt the pressing and stated that she was willing to press charges. Young was charged with Sexual Abuse in the Third Degree. Like the others, Young was taken to District Four, issued a DAT and released, and the charges against him were ultimately dis-

missed. In a civil case brought by Young for false arrest in New York State Supreme Court, a jury found for Young. Iannacone testified at that trial that he had interviewed the victim, who had said that she was annoyed by the male and had given an identification. At the trial of appellants, however, the victim flatly denied making any complaint to the appellants and described their accounts as "fictitious." The victim testified that she had been informed by McDermott that a man standing behind her had made some sort of a gesture toward her; it was for this reason only that she had given McDermott her name and business address.

Count Seven involved Lorenzo Calhoun, who, on March 26, 1984, was arrested at the 42nd Street station of the Lexington Avenue line, taken to District Four, processed, issued a DAT, and released, with the charges against him for Sexual Abuse in the Third Degree ultimately being dismissed. According to Iannacone's memo book entry, Calhoun first rubbed an unidentified woman's left thigh with his newspaper. Although "visibly shaken," the woman purportedly told Iannacone that there was "no problem" and then "went away." Calhoun then supposedly crowded a second female victim against a car door and rubbed "her vaginal area" with his newspaper. Iannacone claimed to have interviewed the second victim, who told him that Calhoun was annoying her without her consent. Appellants' police reports name the second victim as reporting the incident and indicate that she could identify Calhoun and was willing to press charges. Iannacone told the ADA that he had seen Calhoun rub the second victim with his hand; he made no mention of the newspaper described in his reports. At trial, the second victim testified that she had never made the statements attributed to her by Iannacone and that nothing had in fact happened. According to the victim, McDermott said that she had seen a man on the train sticking a newspaper between the victim's legs and that she just needed the victim's name and address for the record. Not only was she never asked if she were willing to press charges, the victim added, but she even told McDermott that she "couldn't testify because [she] didn't feel or see anything."

Finally, Count Eight involved the arrest of Hector Mateo at the 42nd Street station of the Lexington Avenue subway on March 27, 1984. Iannacone allegedly saw Mateo board the train, position himself behind the twelve year old victim and rub against her. Iannacone then ordered Mateo off the subway train, and searched, handcuffed and arrested him. Mateo was never informed of his rights. McDermott told Iannacone in front of Mateo that the victim had said that "she felt something behind her." Appellants' reports indicated that the victim's "aunt"—really a family friend—had reported the incident to the officers and that the girl could identify Mateo and would press charges. Mateo was taken by train to District Four for processing and held in custody for over two days. McDermott's complaint charged Mateo with Sexual Abuse in the Third Degree and Endangering the Welfare of a Child. The charges were ultimately adjourned in contemplation of dismissal. At appellants' trial, the alleged victim and the family friend testified that no one had stood behind the victim during the subway ride in question. According to their testimony, McDermott had asked them to step off the train at 42nd Street, asked the victim for her name, address and Social Security number, and told the family friend that she had seen a man behind the victim rubbing against the victim's back. However, the victim told the family friend that she had not felt anything and the friend told McDermott that nothing had happened. The victim was never asked if she could identify Mateo or if she would be willing to press charges.

At trial, the Government's case included not only the testimony of all eight men arrested by appellants, but also the seven women and one man who were the arrested men's purported victims, several assistant district attorneys from the New York County District Attorney's Office who prepared the criminal charges following interviews with McDermott and Iannacone, and an expert in transit police procedures. The

Government also introduced appellants' diaries and arrest reports, their statements to the arrested men and the purported victims of those men, and their statements to the ADAs, as well as their sworn testimony in Robert Young's civil case. Appellants' evidence consisted of the testimony of two experts, one a lieutenant with the transit police, who testified on transit police procedures, and the other a clinical psychologist and the Director of the Sexual Behavior Clinic at New York State Psychiatric Institute, who testified on "frottage," the clinical term given to the sexual deviation whereby individuals, called "frotteurs," achieve sexual gratification by rubbing or touching the body of non-consenting persons.

## DISCUSSION

Counts One through Three and Five through Eight charged seven separate conspiracies by appellants

to injure, oppress, threaten and intimidate a citizen of the United States in the free exercise and enjoyment of the right secured to him by the Constitution and laws of the United States not to be deprived of liberty without due process of law, in violation of Title 18, United States Code, Section 241 [with the] object ... that the defendants ... acting in their capacity ... would and did arrest a member of a racial minority, ... [here were variously inserted the terms of black man, an hispanic man, a person of apparently hispanic descent, an asian man] knowing that the arrest was false, baseless and without probable cause.

The charge in Count Four was that the appellants,

acting under color of state law, unlawfully, wilfully and knowingly deprived an inhabitant of the State of New York of the right secured to him by the Constitution and laws of the United States not to be deprived of liberty without due process of law [in that] the defendants, acting in their capacity as officers of the Transit Police, arrested a member of a racial minority, to wit, a black man ...

knowing that the arrest was false, baseless and without probable cause

in violation of 18 U.S.C. § 242. At the conclusion of the evidence, following appellants' motion for judgment of acquittal, Fed.R.Crim.P. 29, the court directed the court clerk to eliminate any references to race in the indictment and denied the motion.

■ Appellants' principal argument is that the facts underlying Counts One through Three and Five through Eight do not constitute offenses under 18 U.S.C. § 241. The claim is that "since [its] enactment in 1870, the provisions of Section 241 have *never* before been held to cover an arrest without probable cause by police officers." Brief for Appellants at 14. Appellants contend that section 241 is directed at persons who take the law into their own hands, like members of a mob, vigilantes, the Ku Klux Klan, or the like; it is section 242, they claim, that covers actionable denials of constitutional rights by police officers. Section 241 speaks of "interference" with constitutional rights, whereas section 242 speaks of the "deprivation" of such rights. It is circuitous, the argument runs, to bootstrap section 242 onto section 241 by charging an "interference" with the right "not to be deprived" of a right. We note that violation of section 241 is a felony, carrying an authorized penalty of ten years' imprisonment, while section 242 is a misdemeanor calling for a fine of not more than $1,000 or imprisonment for not more than one year, or both (unless, under the law then in effect, death resulted, in which case imprisonment for any term of years or for life could be imposed).

Appellants place principal reliance on *United States v. Williams*, 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758 (1951) ("*Williams I*"), in which Justice Frankfurter, writing for a plurality of four, said that section 241 "applies only to interference with rights which arise from the relation of the victim and the Federal Government, and not to interference by State officers with rights which the Federal Government merely guarantees from abridgement by the States," *id.* at 81–82, 71 S.Ct. at 587, and

that "interference with civil rights by State officers was dealt with fully by" what is now section 242, *id.* at 75, 71 S.Ct. at 584. Were this case still good law, appellant's argument would have merit. However, in *United States v. Price,* 383 U.S. 787, 798, 86 S.Ct. 1152, 1159, 16 L.Ed.2d 267 (1966), the Supreme Court effectively overruled *Williams I,* clearly establishing the applicability of section 241 to deprivations of Fourteenth Amendment rights. "[W]hatever the ultimate coverage of the section may be," the Court wrote, "it extends to conspiracies otherwise within the scope of the section, participated in *by officials alone* or in collaboration with private persons." *Id.* (emphasis added). As stated in *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), decided on the same day as *Price,* "when § 241 speaks of 'any right or privilege secured ... by the Constitution or laws of the United States,' it means precisely that." 383 U.S. at 753, 86 S.Ct. at 1175.

More recently, judicial analysis of sections 241 and 242 has served to reaffirm that *Price* "outlined the legislative history of [sections 241 and 242] and rejected arguments that they must be interpreted to preclude duplication of rights protected." *United States v. King,* 587 F.2d 209, 211 (5th Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1536, 59 L.Ed.2d 789 (1979). In sum, "[a]ny right protected under § 242 must be included under those protected under § 241." *Id.*

It is also inaccurate to suggest that there has not been a deprivation of rights in this case. False arrest is an act of unlawful detainment that constitutes a violation of due process and in turn is a "deprivation" of a legal right. *See United States v. Garza,* 754 F.2d 1202 (5th Cir.1985); *cf. Conway v. Village of Mt. Kisco,* 758 F.2d 46, 48 (2d Cir.1985) (malicious prosecution sufficient as a cause of action under 42 U.S.C. § 1983), *cert. dismissed,* 479 U.S. 84, 107 S.Ct. 390, 93 L.Ed.2d 325 (1986). In *Garza,* defendant police officers were convicted under both sections 241 and 242 for arresting persons without warrants and without probable cause. *Garza* thus also belies appellant's contention that section 241 has never been used as the basis for a felony prosecution of police officers who made arrests that have been without probable cause.

Appellants' next argument goes only to their conviction under section 242, as charged in Count Four, for depriving Orrett Hall, a non-citizen resident of New York, of his constitutional rights. Since there was only a "very limited detention" in the false arrest of Orrett Hall, they argue, there was no separate inhibition of "the exercise of any Constitutional right." Brief for Appellants at 23. Besides using the words "very limited" in a novel way, appellants' argument is wrong as a matter of law. On his way home from work at the time of his arrest, Hall was ordered off the train at 14th Street, placed under arrest, handcuffed, transported to District Four for processing, and only then released on a DAT. Due process requires probable cause for an arrest, and when police officers acting in bad faith make an arrest without probable cause, the person arrested has suffered a deprivation of liberty without due process of law.

The suggestion that section 242 has never been used in a situation like the one alleged in Count Four is incorrect. In *United States v. Williams,* 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951) ("*Williams II*"), the Supreme Court affirmed the conviction of the defendant police officer who was charged with unlawfully seizing employees suspected of stealing property from the company and then obtaining coerced confessions. The Court held that " '[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of" state law' " within the meaning of section 242. *Id.* at 99, 71 S.Ct. at 578 (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). *See also United States v. Ramey,* 336 F.2d 512 (4th Cir.1964), *cert. denied,* 379 U.S. 972, 85 S.Ct. 649, 13 L.Ed.2d 564 (1965); *United States v. Walker,* 785 F.2d 1237 (5th Cir.1986); *United States v. Alonso,* 740 F.2d 862, 872–73 (11th Cir.1984), *cert.*

*denied,* 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985). As *Ramey* said, "[t]he contention ... that lack of violence or abuse denudes or abates the offense is groundless." 336 F.2d at 514.

We note, however, that the court's sentence for two years was presumably on the felony counts and not on the misdemeanor conviction under Count Four. On remand to the district court, the sentence should be so clarified.

■ The next argument is that the trial court improperly amended the indictment, especially since the opening statements had ethnically identified the witnesses. But the indictment alleged three objects of the conspiracy, not just the one pertaining to the arrest of a member of a racial minority. The additional objects were that the appellants (a) "would and did make an arrest knowing it was false, baseless and without probable cause" and (b) "would and did conceal from the individual arrested and from law-enforcement authorities that the arrest was false, baseless and without probable cause." Moreover, read technically, the language in the charging paragraph of the section 241 counts did not allege that the appellants conspired to interfere with the constitutional rights of members of an ethnic minority but rather that the appellants conspired "to injure, oppress, threaten and intimidate ... citizen[s] of the United States" in the exercise of their constitutional rights. The only reference to race or ethnicity was the factual statement in one of the three objects alleged in each conspiracy count. We do not see that racial motivation was in fact alleged in the indictment.

Thus, what the trial judge struck was only one of the objects of the conspiracies and there is no claim that the jury was improperly instructed on the law of conspiracy. As we held in *United States v. Weiss,* 752 F.2d 777, 787 (2d Cir.), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985), a constructive amendment of an indictment occurs when the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the appellant may have been convicted of an offense other than that charged in the indictment. *See also United States v. Attanasio,* 870 F.2d 809, 817 (2d Cir.1989). Here, the trial proof paralleled the crimes charged. In *United States v. Knuckles,* 581 F.2d 305, 312 (2d Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978), we noted that "convictions are not now set aside except for variances resulting in substantial prejudice to the defendant." The only prejudice claimed here is that the jury was "forcefully focused from the opening statements" on the issue of racial motivation. Brief for Appellant at 26. In fact, race was mentioned only briefly in the opening statement of Iannacone's counsel, who attacked the Government for not saying "anything about ... racial minorit[ies] in their opening statement." Finally, the racial aspects of the case were taken out at the request of appellants.

■ Appellants next challenge the sufficiency of the Government's proof at trial. The crux of the argument is that the testimony of the seven purported victims of sexual abuse—each of whom stated that nothing had happened to her—is "innately of little value" because there is a known and strong reluctance on the part of any female victim to admit to a sexual advance. Brief for Appellants at 29. But the jury rejected that argument and there is no reason that we should reassess the evidence. We note, however, that one victim freely testified that she had been the victim of sexual advances while riding on the subway on several occasions unrelated to the one at trial and that she had also told her parents and husband about these incidents. Appellants also attack the credibility of the eight men falsely arrested, arguing that it would be absurd to suppose that they would admit to the misdemeanors charged. Yet they were subjected to extremely hostile cross-examination that probed at length into their sexual propensities. Accordingly, we reject the appellants' sufficiency claim.

■ Appellants next argue that three statements made in prosecutorial summa-

tions were highly inflammatory and in bad faith. Their first claim is that the Government commented on the appellants' failure to offer any evidence, including their own testimony, in their defense. The second claim involves a reference in appellants' memo books to a notation "CN," which in the Transit Authority Police Department stood for "conditions normal"; the prosecutor said, "that's more like coffee and a nap for these two defendants." And the third point is that the Government made numerous references to lies and liars in both summations, thereby improperly placing its own credibility into the summations.

As to the first comment, at the end of the main summation, after reviewing the testimony of the Government's witnesses, the prosecutor turned to the appellants' argument that they had made the arrests in "good faith." The prosecutor asked the jury to consider the false statements as evidence of the wrongful intent and then turned to the defense case and asked: "Did they offer any explanation for these lies? No. The defendants put on two witnesses." The Government then described the testimony of both defense witnesses; defense counsel objected and moved for a mistrial; the court denied this motion; and the prosecutor finished his discussion of the defense witnesses and concluded his summation without any further objections. Following the Government's summation and a luncheon recess, defense counsel proposed that the trial judge give the jury a curative instruction with respect to the Government's remarks. The judge did so, saying:

> I want you to know that really is not appropriate, and I have indicated that [it] should be stricken from the record, and you are to strike it from your minds as well. The defendants are presumed to be innocent, and they don't have to produce any evidence, nor do they have to call any witnesses. The government has the burden at all times of proving the defendants guilty beyond a reasonable doubt, and that is the primary principle that you have to keep in mind.

While it is axiomatic that the Government may not comment on a defendant's failure to testify at trial, we have held that a prosecutor is entitled to comment on defendant's failure to call witnesses to contradict the factual character of the Government's case, as well as on defendant's failure to support his own factual theories with witnesses. *See United States v. Bubar*, 567 F.2d 192, 199 (2d Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977); *see also United States v. Gotchis*, 803 F.2d 74, 81 (2d Cir.1986). It is only when the evidence that the defendant has not adduced is in the control of the defendant alone or where the jury would naturally and necessarily interpret the Government's summation as a comment on the defendant's failure to testify that the Government's comments run afoul of the Fifth Amendment. 567 F.2d at 199. Here, the Government's remarks amounted to no more than an allusion to appellants' failure to call witnesses to support their theory that the arrests had been made in good faith. Moreover, we think that, particularly in light of the district court's curative instruction, we cannot deem that the remarks in question were anything other than harmless constitutional error. *See United States v. Hasting*, 461 U.S. 499, 507–12, 103 S.Ct. 1974, 1979–82, 76 L.Ed.2d 96 (1983).

■ As to the "coffee and a nap" remark, the Government argues that it was a permissible response to the appellants' summation arguments about their lack of criminal motivation; both defense counsel asked, in effect, why would Iannacone and McDermott make false misdemeanor arrests on the subway and jeopardize their careers to arrest these people. In rebuttal, the Government suggested that by making false arrests the appellants could keep their activity up without having to make any more arrests on the days that they had already attained their necessary "stats" through false arrests. The Government argued that "[i]f you want to stay in anti-crime because there is less supervision, you are out of the public eye ... you make an arrest early in your tour, you go back to the district a couple of hours, you fill out a couple of pieces of paper.... A DAT is

issued, you have your stat for the day, and what do you do for the rest of the day?" The answer to this question, the Government continued, was found in the memo books of Iannacone and McDermott. After they made their one arrest early in their tour, they went to lunch or to dinner; they then rode around on the subways unsupervised and noted every hour on the hour: "conditions normal." The prosecutor then concluded:

> They were falsely arresting somebody at the beginning of their tour, they were getting him out of the way so they didn't have to take him to central booking. All to keep their statistics up and their freedom the rest of the day so they could ride around the subways. No. Conditions normal—CN. That's more like coffee and a nap for these two defendants.

After defense counsel's objection, the trial judge struck the remark. The Government then concluded its rebuttal summation by noting that only as to two counts was another arrest made by the appellants for the rest of the day, and asking:

> [W]here did all the crime go? Is it only at the beginning of the tour? Is there no crime after the first arrest which happens to be in most of the cases the sexual abuse? How about the robberies, the chain snatchings, and the muggings, where does that happen? Apparently nowhere in the vicinity of Officers Iannacone and McDermott.

This prompted a motion for a mistrial, which was denied. We believe, with the Government, that the evidence indicated that in all but two cases the appellants went out to a meal after the men arrested had been processed and reported no additional incidents after the false arrest.

■ Appellants' argument as to the Government's injection of its own credibility into its summation is based on the Government's comments that, "[w]e would be negligent if we didn't meet with our witnesses," and "if we polished ... up [our witnesses] and were so meticulous in the way that we weaved this web of lies ... why didn't we do a better job of it? Why isn't [it] a seamless web? Why are there inconsistencies? ... [W]hy didn't we put this case together so everything fit hand in glove?" But all of the comments objected to were in response to defense counsel's summation to the effect that the prosecution had woven a giant tapestry, planned out the pattern or design, selected the materials that it was going to use and woven them in the fashion that it wanted, and that the witnesses were well manicured and well prepared by the prosecutors in preparation sessions at the U.S. Attorney's office and polished up "like fine stones" when they took the stand. Thus we believe the language complained about is simply " 'rebutting language suitable to the occasion.' " *United States v. Praetorius*, 622 F.2d 1054, 1061 (2d Cir.1979) (quoting *United States v. La Sorsa*, 480 F.2d 522, 526 (2d Cir.), *cert. denied*, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973)), *cert. denied*, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980).

■ Appellants' final argument is that the district court failed to canvass the jury to find out if it had learned of an article about the case that had appeared in the March 10, 1989, *New York Times*. Following the request of defense counsel, the judge stated to the jury the following:

> Now, there has been something in the papers today about this case, rather a lengthy article in one paper. While I haven't seen the others, I have been told it has appeared in other newspapers as well.
>
> Have any of you seen or read those articles? (There is no response).
>
> THE COURT: You haven't even seen them? Well, good for you, I'm very glad, because it really is very important.

The trial judge went on to explain that "[t]he newspaper articles may reflect some things that aren't so," and again admonished the jury to avoid articles about the case. Appellants' suggestion that the jury should have been individually interrogated, even though none had indicated that he or she had seen the articles, is simply not what the law requires. The three-step process set forth in our case law requires the court:

[F]irst, to determine whether the coverage has a potential for unfair prejudice, second, to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individually exposed jurors—outside the presence of the other jurors—to ascertain how much they know of the distracting publicity and what effect, if any, it has had on that juror's ability to decide the case fairly.

*United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); *see also United States v. Rivalta*, 892 F.2d 223, 228 (2d Cir.1989); *United States v. Scopo*, 861 F.2d 339, 349 (2d Cir.1988), *cert. denied*, 490 U.S. 1048, 109 S.Ct. 1957, 104 L.Ed.2d 426 (1989). In the usual case, it is only necessary to examine individually "exposed" jurors outside the presence of the others. In this case, none of the jurors had been "exposed" to the article in question. We note that the jurors were given repeated instructions throughout the trial not to read, listen to or watch news reports about the case.

Judgment affirmed.