**UNITED STATES of America, Appellee,**

v.

**Ronald E. LANGER, Appellant.**

**No. 582, Docket 91–1497.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 12, 1992.

Decided March 10, 1992.

Kevin P. Gilleece, White Plains, N.Y. (Gilleece & Altman, on the brief), for appellant.

James L. Cott, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., Kerry A. Lawrence, Gabriel W. Gorenstein, and Helen Gredd, Asst. U.S. Attys., on the brief), for appellee.

Before FEINBERG, TIMBERS and MINER, Circuit Judges.

TIMBERS, Circuit Judge:

Appellant Langer appeals from a judgment entered May 13, 1991, in the Southern District of New York, Vincent L. Broderick, *District Judge,* upon a jury verdict convicting appellant of violating female drivers' civil rights under color of law, in violation of 18 U.S.C. § 242 (1988). Section 242 provides for a maximum sentence of one year for each violation.

On August 13, 1991, Judge Broderick sentenced appellant to five consecutive one-year terms of imprisonment on the five pre-guideline offenses; to a one-year term of imprisonment on the single guideline offense to run consecutively to the sentences on the pre-guideline counts; and to a one-year term of supervised release on the guideline offense upon completion of his prison terms. Appellant currently is serving his sentence.

Langer's primary contention on appeal is that his conduct was not significant enough to provide a basis for § 242 liability. We disagree.

For the reasons that follow, we affirm appellant's convictions and sentences in all respects.

### I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues on appeal.

During the period out of which the charges arise, February 1987 to January 1988, appellant was a sergeant on the Village of Briarcliff Manor police force. He was convicted of stopping and detaining five female drivers, one of them on two occasions. Each stop took place late at night, on a deserted stretch of the Taconic State Parkway in Westchester County— under the pretense of enforcing intoxi-

cation/driving laws. Although the Parkway passes through Briarcliff Manor, it is not a road on which the village's police force maintains patrol responsibility. Rather, the state police are responsible for patrolling the Parkway. After pulling his victims over and detaining them, he accused each of them—uniformly—of committing traffic violations such as swerving and speeding on the Parkway. He interrogated them as to any drinking they may have engaged in that evening. He did not issue a single ticket to any of his victims. The women who appellant stopped were detained for various periods of time—from 10 to 15 minutes to more than an hour.

All but one of the victims testified at appellant's subsequent trial that they were afraid for their safety during their detentions. The only victim who failed to mention that the experience frightened her was an off-duty New York City police officer. The officer, Fran Calderone, was coming home from work at approximately 3:00 a.m. when appellant pulled her over. Calderone produced her police identification and asked if there was a problem. Appellant, who insisted on calling Calderone by her first name, told her that she was "doing fine" on the "straight aways" but that he was "worried about her" around the turns. Calderone testified that she had not been swerving and that in fact the road was straight. Appellant asked her if she had been drinking and repeatedly inquired whether she was able to drive but did not ask her to get out of her car. After about ten to fifteen minutes of conversation, appellant let her proceed.

Another of the crimes for which appellant was convicted involved a 19–year old victim. On February 28, 1987, at approximately 3:00 am, Jennifer Hummel was heading southbound on the Taconic Parkway, near Campfire Road, when she was stopped by appellant. Despite Hummel's insistence that she had just passed a state police breathalyzer test, appellant refused to permit her to proceed. He insisted on taking Hummel for a ride in his patrol car in order to "sober [her] up." After driving around for some time, appellant pulled his patrol car into a deserted spot overlooking the Croton Reservoir. Hummel testified that, after talking for a brief period, appellant told her that she was "a really good listener and [she] was very understanding, and he thought [she] was very attractive ... [and] he [wanted] to take [her] out." After Hummel declined, stating that she had a boyfriend, appellant persisted in questioning her about her relationship with her boyfriend. Then Hummel requested that appellant return her to her car. He declined, telling her that he did not feel as though she was ready to drive yet. Hummel testified that appellant insisted on taking her to a diner for coffee, even though she told him, "I don't want coffee. I don't like coffee and I really ... don't think I need it." Once at the diner, Hummel told appellant, "I can drink the coffee in my car. Please take me back to my car." He again rejected her request. Eventually, after Hummel drank her coffee, appellant acquiesced and drove Hummel to her car. She testified that, once back at her car,

"I thanked him for taking me for the ride and he said, 'Well, why don't we make it an even exchange. Why don't you give me your phone number?'

I again reiterated I have a boyfriend, like I said at the lake, but he was insistent. So, I gave him my telephone number.

.    .    .    .    .

He walked me to my car and I took my keys and I opened the lock, and [appellant] opened up my car door for me, and when I turned around to get into the car, [he] grabbed me by the shoulders and pushed me against the car with his body and kissed me."

Hummel further testified that, after this incident, she pulled away and threw herself into her car and locked the car and she drove away. The entire incident lasted over an hour. Appellant subsequently called Hummel several times and left messages on her answering machine. Eventually, Hummel returned appellant's calls and told him not to call her again.

Each of the other four counts for which appellant was convicted involved conduct

by appellant which differed from the incidents which we have just described. No useful purpose would be served by detailing the other counts. Our careful review of the record satisfies us that appellant clearly was guilty of stopping and detaining these young women in violation of § 242.

## II.

As we stated above, appellant's chief contention is that "the brief detention of the complainants did not amount to a constitutionally significant violation satisfying 18 U.S.C. 242." We emphatically disagree.

Section 242 makes it unlawful for anyone, "under color of any law, statute, ordinance, regulation, or custom, willfully [to] subject[ ] any inhabitant of any State ... to the deprivation of any rights, privileges, or immunities secured by the Constitution or laws of the United States...."

The Supreme Court has made it perfectly clear that "once a due process right has been defined and made specific by court decisions, that right is encompassed by § 242." *United States v. Stokes*, 506 F.2d 771, 774–75 (5 Cir.1975) (citing *Screws v. United States*, 325 U.S. 91, 104 (1945)); *United States v. Price*, 383 U.S. 787, 793 (1966) (holding that "an offense under § 242 is properly stated by allegations of willful deprivation, under color of law, of life and liberty without due process of law."); *United States v. McDermott*, 918 F.2d 319, 325 (2 Cir.1990), *cert. denied*, 111 S.Ct. 1681 (1991) (quoting *Williams v. United States*, 341 U.S. 97, 99 (1951)) (" 'Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of" state law' within the meaning of section 242."); *United States v. City of Philadelphia*, 644 F.2d 187, 196–97 (3 Cir.1980) (holding that § 242 is "designed to prevent violations of all fourteenth amendment rights").

Section 242 previously has been applied to punish police officers who have abused their authority. *E.g. McDermott, supra*, 918 F.2d 319 (upholding convictions of New York City Transit Police officers for false arrests of subway passengers); *United States v. Alonso*, 740 F.2d 862, 872–73 (11 Cir.1984), *cert. denied*, 469 U.S. 1166 (1985) (upholding conviction of homicide detective for thefts of money from the property room of the police station).

The Supreme Court has held that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person ..." and even a brief seizure "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry v. Ohio*, 392 U.S. 1, 16, 17 (1968); *see Michigan v. Summers*, 452 U.S. 692, 696 n. 5 (1981).

Regardless of the length of time that appellant detained his victims unlawfully, he violated their civil rights. Whether appellant merely stopped his victims in order to engage them in conversation or whether he planned on sexually assaulting them, his conduct was a severe infraction of the Fourth Amendment.

In our view, unlawfully stopping female drivers on a deserted stretch of highway, in the early hours of the morning, under color of law, clearly is "constitutionally significant" conduct. Appellant's falsely accusing his victims of drinking and driving served to compound the anxiety he inflicted.

Our decision today is intended as a sharp warning that the Courts of the United States are not powerless to punish egregious conduct of lawless police officers who violate the civil rights of citizens under the color of state law.

## III.

To summarize:

We reject appellant's contention that his unlawful stopping and detaining of female drivers does not amount to "constitutionally significant" conduct. We have carefully considered all claims of error asserted by appellant and we hold that they are without

merit. We affirm his convictions and sentences in all respects.

Affirmed.